**She'Kenya CLARK, By and Through her natural guardian, Valinda CLARK, Petitioner,**

**v.**

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 88–44V.**

United States Claims Court.

Dec. 4, 1989.

Joseph R. Neal, Augusta, Ga., attorney of record, for petitioner.

Stuart E. Schiffer, Deputy Asst. Atty. Gen., with whom was Michael P. Milmoe, Civ. Div., Torts Branch, U.S. Dept. of Justice, Washington, D.C., for respondent.

## OPINION [1]

HORN, Judge.

This childhood vaccine case, was filed in The United States Claims Court, pursuant to the National Childhood Vaccine Injury Act of 1986 (the Act), Pub.L. No. 99–160, 100 Stat. 3758 (added and amended at 42 U.S.C. §§ 300aa–1 to 300–23 (1986 & Supp. V 1987)). It is before the court on the Special Master's Report and Recommendation and on objections to that Report and Recommendation, filed by both the petitioner and the respondent. The petitioner, specifically objects to those portions of the Special Master's Report and Recommendation which: (1) fail to award any compensa-

tion for future pain and suffering and (2) relate to the amount awarded for attorney fees. The respondent objects to those portions of the Special Master's Report and Recommendation which interpret the provisions and award made pursuant to: (1) 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) to cover loss of earnings, pain and suffering and attorneys' fees and other costs, (2) 42 U.S.C.A. § 300aa–15(a)(1)(A) (West Supp. 1989), which appears to allow compensation for "leisure and recreational" expenses and (3) 42 U.S.C.A. § 300aa–15(g) (West Supp. 1989), for the failure to off-set compensation awarded for payments reasonably expected to be made by other entities.

Jurisdiction for the case is vested in the United States Claims Court under the Vaccine Act, 42 U.S.C.A. §§ 300aa–12(a) to (d), (West Supp.1989) and pursuant to United States Claims Court General Order No. 23, published on January 25, 1989, which promulgated The Vaccine Rules of the United States Claims Court.

On May 23, 1989 the parties entered into a stipulation of fact, which resolved the issue of causation in the petitioner's favor, and concluded that the petitioner, She'Kenya Clark, met the statutory eligibility requirements for compensation under the Vaccine Compensation Program. Subsequently, the Special Master received and reviewed the materials submitted by the petitioner on the issue of damages and sent his Report and Recommendation to this Judge.

After consideration of the submissions of the parties, the evidence produced at the hearing, held before the Special Master on May 31, 1988, the Report and Recommendation of the Special Master and the oral argument held before this Judge on October 27, 1989, this court finds that the petitioner should receive an award for pain and suffering and that the petitioner's counsel should be compensated for legal fees and

---

1. This decision may contain information which may not be disclosed to a nonparty. *See* 42 U.S.C.A. § 300aa–12 (West Supp.1989). Accordingly, within fourteen (14) days of the date of filing this decision, the parties shall designate any material subject to subsection 300aa–12 and such designated material will be deleted for public access. If on review of the report, there are no objections filed within the fourteen (14) day period, then it shall be deemed that this report does not contain material subject to subsection 300aa–12.

costs, but the court agrees with the respondent's interpretation of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) that the award for pain and suffering, loss of future earnings and attorneys' fees and other costs must be limited to $30,000.00. Regarding petitioner's claim for items listed as "leisure/recreational" equipment, the court rejects respondent's objection and awards the claimed amount to the petitioner. The court further finds that although the statute appears to require an off-set, for primarily liable payors and providers, the respondent has failed to prove that the petitioner in this case will receive such monies with any degree of certainty. Accordingly, any off-set from the compensation awarded by this court is premature. Petitioner, therefore, is awarded $2,802,-885.00.

## BACKGROUND

On November 2, 1988, pursuant to 42 U.S.C.A. §§ 300aa–1 to 300aa–23 (West Supp.1988),[2] She'Kenya Clark, petitioner, by and through her natural guardian, Valinda Clark, instituted this action in the United States Claims Court, against the Secretary of the Department of Health and Human Services. The action was initiated by filing a petition seeking compensation under the aforementioned Act for injuries sustained by She'Kenya as a result of an adverse reaction to the second in a series of three vaccinations for diphtheria, pertussis, and tetanus (D.P.T.). The petition was accompanied by numerous supporting medical documents, which represented She'Kenya's three and one-half (3½) years of medical history. The case was assigned to a Special Master and to this Judge, pursuant to Rule 16 of the Vaccine Rules of the United States Claims Court.

On behalf of the respondent, the Secretary of the Department of Health and Human Services, the United States Department of Justice filed its general denial answer on December 28, 1989. After only limited participation in this case, on April 27, 1989, the respondent submitted a mo-

tion to suspend the proceedings in the above captioned case, and in all other cases filed under the National Vaccine Injury Compensation Program, for ninety (90) days, due to what the Department of Justice alleged were "systemic problems" which affect the National Vaccine Injury Compensation Program and which have "reached critical proportions." A letter accompanying respondent's motion, also informed the court that it was respondent's intention to limit participation by counsel in all vaccine proceedings in the future.

Action on the motion to suspend was assigned to Chief Judge Smith, due to the general nature of the motion and the request to suspend proceedings in all vaccine cases then pending before the court. Chief Judge Smith held a hearing on the motion to consider the extraordinary nature of the respondent's request. He issued an Opinion and Order on May 16, 1989, denying the respondent's motion to suspend these and other proceedings and ordered respondent's counsel to clarify its role as counsel. *She'Kenya Clark v. Secretary of the Dep't of Health and Human Services*, No. 88–44–V (May 16, 1989). In so holding, the court reasoned:

While the court sympathizes with respondent's recitation of the problems resulting from a confluence of pressures—the Vaccine's Act 365-day decision timeframe, respondent's lack of resources and the procedures for determining entitlement to compensation under the Vaccine Act—the court is convinced that it is respondent's (both the Department of Justice and the Department of Health and Human Services) lack of resources that has precipitated respondent's extraordinary request to suspend all vaccine cases. However, the government's lack of resources cannot be allowed to penalize petitioners. When the United States undertakes a statutory program, this court must presume that it has the minimal resources required to carry-out the statute.

2. The court has utilized the most recently updated 1989 version of the United States Code Anno-

tated, except where specific reference to an earlier version was used by one of the parties.

*Id.* at 6. The court also stated that: "However, while any court would hopefully consider a party's occasional request, from either petitioner or responden´ for relief from a scheduling or filing conflict, to tailor the entire procedural process around one side's lack of resources would make a mockery of the judicial process". *Id.* at 10. Additionally, the court recognized that in the alternative to a full hearing, the Act is sufficiently flexible to permit informal settlement procedures and "in fact, they are greatly encouraged." *Id.* at 14.

In his May 16, 1989 Opinion and Order, Chief Judge Smith also required the Department of Justice to respond to a series of questions posed at the conclusion of the Order. In response, the Department of Justice filed the following comments on May 26, 1989:

(1) Given the current status of the resources available to the Department of Justice and the Department of Health and Human Services, full participation as currently envisioned by the Court in this case [Clark] and the remaining cases filed under the National Vaccine Injury Compensation Program is not possible. Regretfully, the Department of Justice has no option but to withdraw from participating in cases under the Program until such time as circumstances permit. Accordingly, in those cases in which a Department of Justice attorney is currently designated, a formal notice of withdrawal will be filed contemporaneous with this response or shortly hereafter. In a select number of cases in which settlement is imminent, a notice of withdrawal will not be filed so that settlement may be facilitated without undue delay.

(2) At this time, new Department of Justice attorneys will not be designated in cases from which an attorney has withdrawn or in which no appearance has yet been filed. The Secretary of Health

and Human Services will not be entering a separate appearance in cases under the Program.

On May 23, 1989, the parties in the above captioned case, entered into a stipulation of fact by which the respondent stipulated to the facts necessary to meet the statutory requirements of vaccine injury causation, which resolved the issue of causation in the petitioner's favor, leaving only the issues relating to damages to be resolved. On May 26, 1989, the Department of Justice attorneys assigned to the above captioned case withdrew as counsel.[3]

At the request of the Special Master, the petitioner submitted a series of memoranda, briefs and other documents, to which the respondent opted not to respond. A hearing was held before the Special Master on May 31, 1989, pursuant to 42 U.S.C.A. § 300aa–12(c)(2)(D) (West Supp.1989), at which the petitioner's counsel was present and presented evidence in support of the claim. No one appeared at the hearing from the Department of Justice to represent the respondent, nor did anyone appear from the Department of Health and Human Services on behalf of the respondent, the Secretary.

The petitioner's case included testimony from Z. Sigmund Sachs, an accountant from Baltimore, Maryland, who described the computation process necessary to determine the future cost of care for the petitioner, reduced for, purposes of the award, to net present value; deposition testimony of Dr. David C. Abramson, M.D., a physician with a sub-specialty in the area of newborn and prenatal medicine, as to the cause and effect of She'Kenya's injury, which was read into the record, a videotape showing She'Kenya during an evaluation of her condition was submitted and, finally, Judy Edwards, a rehabilitation therapist with a Master's Degree in rehabilitation and a member of Sink, Caldwell, and Gannaway, Inc., a rehabilitation consulting

**3.** John Lodge Euler, Deputy Director, Torts Branch, United States Department of Justice and Charles R. Gross, Civil Division, Torts Branch, United States Department of Justice, attorneys for the respondent withdrew as counsel for the respondent on May 26, 1989. On August 17, 1989, after the Special Master had filed his Report and Recommendation, Michael P. Milmoe, Trial Attorney, Torts Branch, Civil Division entered a Notice of Appearance in the case.

firm, testified that she assisted in the preparation of She'Kenya's Life Care Plan and went on to explain the contents of the Plan, as well as to describe She'Kenya's rehabilitation potential.

The Special Master issued his Report and Recommendation on July 28, 1989. Petitioner's brief objections thereto were filed on August 16, 1989 and on August 17, 1989, a new attorney for the Department of Justice filed a notice of appearance, along with written objections to the three aspects of the Special Master's Report and Recommendation, described above, which, however, was not accompanied by any factual evidence.

On October 27, 1989, this court held an oral argument in the case to specifically address, among other issues, the objections to the Special Master's Report filed by both parties. At the argument before the judge, both the petitioner and respondent were represented by counsel.

## DISCUSSION [4]

Petitioner, She'Kenya Clark, the daughter of Valinda Clark and Julius Clark, was born on July 15, 1985 at University Hospital in Augusta, Georgia. On November 22, 1989, the petitioner received the second in a series of three DPT vaccines, in Augusta, Georgia. On the evening of the administration of the said vaccine, the petitioner suffered an adverse reaction to the DPT vaccine, by running a fever and experiencing seizures and encephalopathy within 48 hours. The record does not exhibit, by a preponderance of evidence, that the encephalopathy was due to factors unrelated to the November 22, 1985, administration of the DPT vaccines.

Since that time, petitioner has continuously exhibited signs of impaired mental and neurological abilities, along with recurrent seizure activity. Dr. David C. Abramson, M.D., a physician with board certification in pediatric medicine and in the sub-specialty of newborn and prenatal medicine, when questioned during a deposition, which was read into the record at the hearing on May 31, 1989, described the cause and extent of She'Kenya's disabilities, as follows:

That would be a combination of the first and second trivalent vaccine, that is a vaccine consisting of antigens for diphtheria, pertussis and tetanus was given to her routinely at two months after birth. And the second shot was given on the 22nd of November 1985. And she had a very serious reaction including central nervous system manifestations to that second shot.

As a resultant encephalopathy that has been static, but resulted in pretty complete destruction of her central nervous system.

As of April 27, 1987, in a report submitted with the original petition, She'Kenya's problems were listed by Mr. Boardman of Neuro–Developmental Treatment Programs, Inc., based upon an initial occupational therapy evaluation, as:

1. Fluctuating muscle control, greater on left than right.
2. Poor trunk, head, and shoulder control.
3. Poor gross motor skills.
4. Delayed fine motor skills and no bilateral hand skills.
5. Delayed developmental skills for age.

This report listed She'Kenya's short term goals as follows:

1. She'Kenya will hold a spoon in her right hand and take 2 scoops of applesauce with minimal guidance in therapy.
2. She'Kenya will sit independently in ring sitting with straight spine with her elbows resting on a bench for 20 seconds, in therapy.
3. She'Kenya will reach above her head to grasp an object with her right upper

4. The facts necessary to resolve issues relating to damages have been taken from the petition and the exhibits and supporting affidavits provided by the petitioner throughout the course of this proceeding. Due to the government's choice to participate minimally and then totally to withdraw from representing the respondent, the Secretary of the Department of Health and Human Services, most of the facts, available for review by the court, have been developed solely by the petitioner and/or from uncontested information submitted by the petitioner.

extremity in therapy while independently ring sitting with a straight back bearing on her left upper extremity which is on a bench.

Furthermore, She'Kenya's long term goals were listed by Dr. Boardman as:

1. She'Kenya will independently, while seated in a child's chair with a back or high chair, feed herself pudding or other pureed food with a spoon held in her right upper extremity.

2. She'Kenya will, while independently ring sitting, push a 6″ ball to her front using the bilateral upper extremities.

3. She'Kenya will remove a child's loose fitting pullover shirt with minimum physical guidance in therapy.

4. She'Kenya will independently drink from a cup while in supported sitting.

Speculations on She'Kenya's future were also offered at the hearing by Dr. Abramson and Judy Edwards, who participated in the preparation of the Life Care Plan for She'Kenya Clark. Due to She'Kenya's cognitive functioning and poor physical functioning, she was described by Ms. Edwards as having no potential for future employment or for that matter of ever being able to do any type of independent self care activities. Dr. Abramson indicated that She'Kenya will require anti-seizure medication for the rest of her life. Additionally, based on the cross-examination of Ms. Edwards by the Special Master, it was revealed that She'Kenya may experience related physical problems, such as, respiratory infections, urinary tract infections and/or blood clots, due to her physical inabilities.

## DAMAGES

The Vaccine Act classifies each case as either prospective or retroactive, depending on whether the vaccine was administered before or after October 1, 1988, the effective date of the Vaccine Act. 42 U.S.C.A. § 300aa–15 (West Supp.1989). The calculation of compensation for vaccine-related injuries or death is different for the two categories of cases. Compensation for injuries or deaths related to vaccines administered prior to the effective date of the Act are covered under 42 U.S.C.A. § 300aa–15(b) (West Supp.1989). She'Kenya Clark received the second in a series of DPT vaccinations on November 22, 1985, prior to the effective date of the Act. The instant case is, therefore, deemed a retroactive case under the statute.

Under the Vaccine Act, compensation for a vaccine related injury may be awarded in retroactive cases for actual unreimbursable expenses, incurred from the date of judgment, for medical or other remedial care, diagnosis, rehabilitation, evaluation, special education, vocational training and placement, counseling, special equipment, and other expenses, determined to be reasonably necessary. The petitioner is entitled to an award for pain and suffering, loss of earnings, and reasonable attorneys' fees and other costs incurred in pursuing a claim. 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) also contains certain limitations on the amount to be awarded in retroactive cases.[5] Additionally, 42 U.S.C.A. § 300aa–15(f)(4) requires that a compensation award shall be determined on the basis of the net present value of the elements. Any compensation award is to be reduced by the amount that reasonably can be expected to be received "under any state compensation program, under an insurance policy, or under a Federal or State health benefits program, or by an entity which provides health services on a prepaid basis." 42 U.S.C.A. § 300aa–15(g) (West Supp.1989).

In the case at bar, the Special Master awarded $2,836,885.00 for "unreimbursable

---

**5.** 300aa–15(b) Vaccines administered before effective date.

Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(B)

of subsection (a) of this section and may include attorneys' fees and other costs included in a judgment under subsection (e) of this section, except that the total amount that may be paid as compensation under paragraphs (3) and (4) of subsection (a) of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.

costs of future medical expenses under § 15(a)"[6] In making his recommendation, the Special Master concluded that "Under § 15(a)(1)(A) of the Vaccine Act, compensation awarded to a petitioner shall include actual unreimbursable expenses incurred from the day of judgment for a variety of services which may together be described as custodial medical, remedial, and rehabilitative." The Special Master, however, did not distinguish between specific compensation amounts for the various award categories under 42 U.S.C.A. § 300aa–15(a) (West Supp.1989), other than to state, "in view of the authoritative nature of the annuitist's report on the cost of compensating the petitioner for custodial, medical, remedial and rehabilitative expenses, the award of its value is properly supported."

Each case filed under the Vaccine Program is factually unique and must be evaluated on a case-by-case basis. Each petitioner who seeks compensation for an injury sustained from a vaccine that is covered under the Act, has had a uniquely different medical reaction and requires a compensation package tailored to his or her specialized needs. Moreover, these cases come from all regions of the country, and are based upon different medical opinions and differing costs of medical care.

Prior to making a determination as to the appropriate compensation award, it is essential to consider, carefully, the evidence presented by the petitioner, in order to determine if the petitioner has met the burden of proof, to the satisfaction of the court, on each category for which compensation is claimed. The theory of burden of proof finds its application in the trial of every case or in determining eligibility for government assistance under non-judicial or quasi judicial programs. Long and trusted it has withstood the test of time and reason.

■ The burden of proof fixes upon the party who has the duty of first going forward with the case, the responsibility of convincing the decision maker of the wor-

thiness of the cause being pled. The evidence presented must amount to more than a scintilla or insignificant amount in order to justify a favorable verdict. E. Cleary, *McCormick On Evidence* (1984) 953. If a party has introduced sufficient evidence to make out a prima facie case, then, in the absence of evidence to controvert such a case, the jury, or in this case the judge, would be bound to find in the party's favor. By the making of a prima facia case, a party has sustained the burden placed upon them and will prevail, unless their position is cast in doubt by additional facts introduced by the opponent.

■ The burden of producing evidence, often termed the burden of going forward, is a duty owed to the trial judge to satisfy the judge that there is sufficient evidence from which a jury, or judge, could reasonably infer the existence of the fact to be proved. *De Marines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1200 (3d Cir.1978) (citing IX *Wigmore on Evidence* § 2487 at 278–9 (3d ed. 1940)). Only after the initial burden of producing evidence has been met, does the burden of ultimate persuasion arise. The party who bears that burden, in effect, bears a "risk of non-persuasion," for that party must persuade the fact-finder that the existence of a fact is more probable than its non-existence, in a civil case, or risk an adverse finding. *Id.* (citing C. McCormick, *Law of Evidence* § 339 2d ed. 1972)).

■ Generally, in a civil case, the party with the burden of proof must persuade the trier of fact by a preponderance of the evidence. *Rivera v. Minnich*, 483 U.S. 574, 578, 107 S.Ct. 3001, 3004, 97 L.Ed.2d 473 (1987). *See also* E. Cleary, *McCormick's Handbook on the Law of Evidence*, § 339 (1972)). The most acceptable meaning to be given to the expression, proof by a preponderance, seems to be proof which the jury, or judge, is to find that the existence of a contested fact is more probable than its nonexistence. E. Cleary, *McCor-*

6. Although the correct citation should be 42 U.S.C.A. § 300aa–15(b) (West Supp.1989), which governs retroactive cases such as the instant one, section 300aa–15(b) does refer back to section 300aa–15(a) for a list of specific reimbursable expenses.

*mick's Handbook on the Law of Evidence,* § 339 (1984).

▮ It is true that a higher burden of proof, by clear and convincing evidence, is appropriate in a limited range of civil actions. Among the classes of cases to which this higher standard of persuasion has been applied are the following: (1) charges of fraud and undue influence; (2) suits on oral contracts to make a will, and suits to establish the terms of a lost will; (3) suits for the specific performance of an oral contract; (4) proceedings to set aside, reform, or modify written transactions or official acts on grounds of fraud, mistake or incompleteness; and (5) miscellaneous types of claims and defenses. *Id.* at § 340. However, it would be incorrect to hold in an action such as this, for which Congress undisputedly relaxed the standards associated with causation, to require the higher burden of proof. Thus the correct standard of proof in this case, logically, can only be that of preponderance of the evidence.

In fact Congress, specifically chose the preponderance test for cases coming under the Vaccine Act. The text of the Vaccine Act, 42 U.S.C.A. § 300aa–13 (West Supp. 1989) is as follows:

§ 300aa–13. Determination of eligibility and compensation

(a) General rule

(1) Compensation shall be awarded under the Program to a petitioner if the court finds on the record as a whole ...

(A) that the petitioner has demonstrated by a *preponderance of the evidence* the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

(Emphasis added). 42 U.S.C.A. § 300aa–13 (West Supp.1989).

▮ In the case at bar, the petitioner has successfully substantiated the claims made in the petition by presenting evidence which meets or exceeds the statutory burden. In support of petitioner's request for compensation, petitioner has presented to the court a petition, together with 3½ years of detailed and exhaustive, medical records, and various miscellaneous documents, testimony presented during the course of the hearing held before the Special Master on May 31, 1989, and briefs, pursuant to requests from the Special Master. Of particular importance was the report prepared by Jack M. Sink, Ed.D., C.R.C., C.V.E. and Judy Edwards, M.Ed., D.T., C.R.C., of Sink, Caldwell & Gannaway, Inc., a rehabilitation consulting firm which was presented at the hearing before the Special Master. This report, labeled Life Care Plan for She'Kenya Clark dated March 20, 1989, includes cost projections for the following thirteen categories: projected evaluations; projected therapeutic expenses; wheelchair needs; wheelchair accessories; orthotics/prosthetics; orthopedic equipment need; aids for independent functioning; drug/supply needs; future medical care; transportation; leisure/recreational equipment, home care/institutional care; potential complications; and loss of earning capacity.

In preparation of the Life Care Plan, Dr. Sink and his associate, Ms. Judy Edwards, reviewed She'Kenya's medical records and interviewed the client and her mother, to determine what services will be required in the future for petitioner's care and to project the costs of those services. Dr. Sink and Ms. Edwards, in the Life Care Plan, have presented two alternate plans: one that, based on today's market cost, projects the cost for institutional care and the other which projects the cost for a continued home care arrangement.

At the hearing before the Special Master, the deposition testimony of Dr. David C. Abramson, a physician with sub-specialty in the area of newborn and prenatal medicine, who reviewed the Sink, Caldwell, & Gannaway, Inc., Plan and the cost projections thereof was introduced. He stated:

"I think if anything it is a little bit too conservative, but it certainly is a very realistic plan and one that I think would be adequate for She'Kenya Clark's needs."

■ In addition to the report prepared by Dr. Sink and Ms. Edwards, the petitioner submitted the reports of Z. Sigmund Sachs, a Certified Public Accountant, with over 40 years of experience, and of Bruce Wolfe, an annuitist with over 25 years of insurance claims experience. In order to make allowance for the earning power of money, both men calculated the net present value for the stream of future costs projected by the Life Care Plan, as prepared by Dr. Sink and Ms. Edwards. Calculating the net present value for the stream of future costs is the process required by 42 U.S.C.A. § 300aa–15(f)(4) (West Supp.1989) of the Vaccine Act, and is in fact a method of determining the value of future payments used in comparable litigation. *Chesapeake & Ohio Ry. Co., v. Kelly,* 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916); *St. Louis Southwestern Ry. Co. v. Dickerson,* 470 U.S. 409, 411–12, 105 S.Ct. 1347, 1348–49, 84 L.Ed.2d 303 (1985). The court notes that it is within this court's discretion to select the proper method of discounting the estimated stream of earnings in the future, *Jones & Laughlin Steel Corp. v. Pfeiffer,* 462 U.S. 523, 552–53, 103 S.Ct. 2541, 2558–59, 76 L.Ed.2d 768 (1983) and that there is no consensus method of projecting a present value in litigation. *See Jones & Laughlin Steel Corp. v. Pfeiffer,* at 541, 103 S.Ct. at 2552–53.

Two methods of calculation have been widely recognized: a two step and a one step process. In the two step process, first, an economist projects an increase for inflation in the cost of the current value of the future services. Then the economist "discounts" the inflated values, i.e., he de-

termines a present amount which could be invested, at a given reasonable rate of return, to yield, over the remaining time, an amount equal to the inflated value. The assumption in this process is that the rate of return on investments is greater than the rate of inflation.

Within the last 15 years, some economists have favored a one step process. *See Jones & Laughlin Steel Corp.,* 462 U.S. at 541–42, 103 S.Ct. at 2552–53. Economists seem to reason that inflation directly affects the rate of return on investments. They assume that investors fear inflation and, therefore, require that borrowers pay more interest than expected inflation. Thus, the amount paid back will be worth sufficiently more than the amount lent. On this assumption, the modern economists' present value calculation does not project inflation. Instead, it discounts the future expenses (at a value in "current dollars") by the difference between the rate of return and rate of inflation. This difference is often labeled "the real rate of interest."

This more recent approach is the one that the accountant, Mr. Z. Sigmund Sachs, used in his analysis. He took the numbers from the Life Care Plan, and discounted them by five (5%) percent, over She'Kenya's possible life to achieve present values. At the oral hearing held before the Special Master on May 31, 1989, and in his report, based on the projections included in She'Kenya's Life Care Plan, Mr. Sachs projected the costs of She'Kenya's future without institutionalization and with institutionalization, after age 21.[7]

Subsequently, on June 23, 1989, the Special Master, apparently unsatisfied by what he perceived to be Mr. Sachs' incomplete analysis of She'Kenya Clark's Life Care Plan, ordered the petitioner to furnish additional information on the Life Care Plan,

---

7. Based on the evidence, the court deems institutional care to probably be required for petitioner during her adulthood. In analyzing Mr. Sachs' institutional care projections, the court recognizes that while Mr. Sachs' two-step methodology has been widely utilized in this field, due to his use of incorrect base numbers out of the Life Care Plan, the court must reject his

calculations. Mr. Sachs utilized the numbers provided him in the Life Care Plan, however, in determining the figure for institutional care Mr. Sachs failed to deduct corresponding amounts for the construction of a home and attendant's quarters, which would not be required if petitioner was cared for out of the home.

addressing the life expectancy of persons of She'Kenya Clark's condition and providing amplification on the claimed net present value of several items for which compensation was claimed by the petitioner. In response, the petitioner submitted the report of Bruce Wolfe, an individual with more than 25 years of claims experience, currently in charge of Ringler Associates, Atlanta, Georgia office. Mr. Wolfe's report reviewed the Life Care Plan prepared by Dr. Sink and Ms. Edwards from the perspective of an insurance professional and evaluated She'Kenya's life expectancy as a market factor. Using published rates of inflation obtained from the Department of Health and Human Service,[8] Mr. Wolfe also provided a method of excluding the unsupported costs of constructing a home and attendant's quarters in the event that institutional care was chosen for She'Kenya.

Although the petitioner presented a carefully prepared case, other than filing a formal general denial by way of an answer submitted on December 28, 1989, and filing only a brief set of three objections to the Special Master's Report and Recommendation, filed without factual support by way of affidavits or documentary evidence, the petitioner chose not to participate in the proceedings before the Special Master. By refusing to become engaged, the respondent, in essence, accepted the validity of each item of documentary evidence and the testimony of each witness, presented by the petitioner. Absent a glaring discrepancy in the record, the court is left with little choice, but to do likewise. The Special Master tried to refine certain aspects of the evidence presented, but it should not be his role, nor that of the Judge, to develop the whole case for either side.

For two centuries, common law judges and lawyers have regarded the opportunity to cross-examine as an essential safeguard of the accuracy and completeness of testimony. *See* E. Cleary, *McCormick On Evidence* § 19, at 47 (3d ed. 1984). The apportionment of the task of adducing evidence is one of the most characteristic features of the Anglo–American system. It is placed wholly upon the parties to the litigation; it is not required nor expected of the Judge. J. Wigmore, 9 Evidence In Trials And Common Law, § 2483 (1981). However, when the system breaks down, such as here, due to the governments refusal to participate in the proceedings before the fact finder, then the entire judicial process, as well as the findings based thereon, become at least somewhat speculative.

The court must question the wisdom of the refraining from involvement. Although normally the front line defense to protect the public Treasury from improper or inflated claims in litigation, the Department of Justice and the respondent government agency, here the Department of Health and Human Services, have taken a mostly passive role in these proceedings. Except for contesting the $30,000.00 limit

---

**8.** The Board of Trustees, Federal Old Age and Survivors Insurance and Disability Insurance Trust Funds periodically transmits to Congress a report. 42 U.S.C. §§ 401(c)(2), 1395i(b)(2) & 1395t(b)(2) This report may contain, as did the report in 1986, interest rate projections. 1986 Report of the Board of Trustees of the Federal Old Age and Survivors Insurance and Disability Insurance Trust Funds, 99th Congress 2d Session, House Document 99–189, April 8, 1986, U.S. Government Printing Office, 1986 at 32.

Taking these projections, Mr. Wolfe then determined the projection for individual categories by comparing the average of that category and the base rate of inflation projected over the years.

The Social Security Trustees report in 1986 projected future inflation at various rates. 4.00% annually was termed in this projection to the "intermediate."

|  | Assumed Rate of Inflation |
|---|---|
| Projected Evaluations | 6.00% |
| Projected Therapeutic Services | 6.00% |
| Wheelchair Needs | 3.00% |
| Wheelchair Accessories | 3.00% |
| Orthotics/Prosthetics | 3.00% |
| Orthopedics | 3.00% |
| Aids for Independent Functioning | 3.00% |
| Drug/Supply Needs | 3.00% |
| Future Medical Care | 6.00% |
| Transportation | 4.00% |
| Leisure/Recreational Equipment | 4.00% |
| Home Care OR Institutional Care | 4.00% |
| Potential Complications (Hospital) | 8.00% |

for pain suffering, impaired earnings and attorneys' fees and costs and the claimed amount for "leisure and recreational equipment", the government agencies have conceded that the court should award almost whatever the petitioner claims for compensation. In the alternative the agencies must intend that the Special Master and/or the Judge should assume the unusual role, equivalent to that of a claims adjuster, and review the petitioner's compensation claims, without assistance from the government. In prospective cases, the government's abstinence will become even more questionable, because under the Vaccine Act, the Department of Health and Human Services would appear to have a direct fiduciary duty to protect the trust fund, out of which compensation in prospective cases will be paid. The failure to participate in those cases could be viewed by some as a breach of a fiduciary duty.

Based on the evidence presented in this case by the petitioner, and given the respondents decision not to participate in the development of the evidence, the court awards the petitioner, She'Kenya Clark the compensation award, detailed below. In so doing, the court has broken down the award package available under 42 U.S.C.A. §§ 300aa–15(b) and (a)(1)(A) (West Supp. 1989) for actual unreimbursable expenses in a similar manner to the approach taken by Dr. Sink and Ms Edwards, and adopted by Mr. Wolfe in his report. Moreover, based on the testimony of Dr. Abramson, Ms Edwards, the Life Care Plan and the Special Master's Report and Recommendation, the court finds that She'Kenya Clark will need institutional care at 21.

Future Medical and Rehabilitation Expenses:

| | |
|---|---|
| Projected Evaluations | $ 78,583.00 |
| Wheelchair Needs | 16,407.00 |
| Wheelchair Accessories | 13,199.00 |
| Orthotics/Prosthetics | 8,177.00 |
| Orthopedic Equipment | 13,830.00 |
| Aids for Independent Functioning | 995.00 |

| | | |
|---|---|---|
| Drug/Supply Needs | $ | 19,670.00 |
| Future Medical Care | | 44,985.00 |
| Leisure/Recreational Equipment | | 11,012.00 |
| Potential Complications (Hospital) | | 192,503.00 |
| Cost of Institutional Care | | 1,242,445.00 |
| 2. Loss of Earnings, Pain and Suffering, and Attorneys' Fees and Other Costs | | 30,000.00 |
| 3. Statutory Off-set | | 00.00 – |
| | | $2,802,885.00 |

## 1. Future Medical and Rehabilitation Expenses [9]

*Projected Evaluations, $78,583.00.* She'Kenya Clark will require evaluations to assure comprehensive treatment. The projected evaluations include: physical, speech, behavioral, internist, nutritionist, ophthalmology, neurologist, developmental pediatrician, dental, urologist, occupational therapy. The pediatrician/internist will serve to coordinate the various medical services and care. The neurologist is needed to evaluate She'Kenya's seizure condition and response to medication. Since persons with developmental disabilities have difficulty in regulating their diets, necessary for growth and maintaining a proper body weight, the bi-annual nutritional evaluation will identify She'Kenya's nutritional needs. The physical, behavioral, occupational and speech therapy evaluations will establish annual goals and programs for She'Kenya's therapy. In addition, She'Kenya's visual impairment will require annual evaluations by an ophthalmologist and regular dental care is necessary because oral hygiene is difficult to maintain in persons with neuromuscular limitations. Urological check-ups are necessary because She'Kenya will most likely be subject to frequent urinary tract infections.

*Projected Therapeutic Services, $1,131,079.00.* She'Kenya will require physical therapy one to three (1–3) times per week during her school years to supplement the therapy she will receive in school. This therapy includes behavioral, physical, guid-

9. The award number reflects the estimated value of the annuity as of July 13, 1989, when the annuitist, Mr. Wolfe, calculated the present value based on figures provided in the Sink, Caldwell, & Gannaway, Inc., Life Care Plan for She'Kenya Clark which was completed on March 20, 1989. The court presumes that these figures continue to be sufficiently current, since neither the petitioner nor the respondent have objected to the use of these numbers or commented on the section which addressed this issue in the Special Master's Report and Recommendation. Of total category for future medical and rehabilitative expenses, the respondent has taken no objection to, and therefore, apparently conceded, all but the leisure and recreational equipment award recommended by the Special Master.

ance from a rehabilitation case manager, financial counseling and management, occupational therapy, and speech therapy. Additionally, this therapy will allow She'Kenya to reach her maximum, potential functioning level, and then to maintain that level of strength and flexibility. After she leaves the school environment, physical therapy is to be continued three (3) times per week. In addition, occupational and speech therapy should be continued twice (2) a week until age twenty-one (21).

Under this category, the Life Care Plan also indicated that both She'Kenya and her mother would benefit greatly from behavioral therapy, designed to help She'Kenya express her needs more effectively. Further, the Plan indicated that the availability of a rehabilitation case manager will assist Ms. Clark in coordinating She'Kenya's medical care and equipment needs, as well as identify new developments in treatment and equipment, which could be beneficial, and that the availability of a financial manager will assist in paying bills and planning for future needs.

*Wheelchair Needs $16,407.00.* She'Kenya will need several different types of wheelchairs at any given time, as well as a constantly changing selection as she grows. The Mainstreamer will be She'Kenya's primary chair during the school day. The Carrie Rover is a lighter, more easily transportable chair that should serve as a back-up chair and provide mobility in less accessible environments. The Comfort chairs will be She'Kenya's primary source of mobility as an adult, while the Shower/Commode chair will assist She'Kenya's attendant in caring for her needs.

*Wheelchair Accessories, $13,199.00.* She'Kenya will require a Roho cushion to ensure proper seating posture. The various trays will help in activities of daily living. Furthermore, maintenance is required to keep the chair in good working order.

*Orthotics/Prosthetics, $8,177.00.* She'Kenya will require ankle-foot orthotics to position and support her ankles during walking activities.

*Orthopedic Equipment Needs, $13,-830.00.* This equipment, for exercising and positioning will be used during therapy sessions. This equipment may also serve a dual function in that while the equipment is primarily designed for exercising and positing, some of the equipment may also be used during play activities. This equipment includes: walkers (child and adult); tumble forms (Grasshopper (child and adult)); standers (child and adult); exercise mat, mat table; tumble forms maintenance kit; and neurodevelopment training balls (small and medium).

*Aids For Independent Functioning, $995.00.* These items include: three (3) scoops with straps; three (3) raised-lip dishes; a drinking mug with handles; a communication board; and a hoyer lift replacement sling. These items are necessary to help She'Kenya's mother and attendant feed She'Kenya and teach her self-feeding skills. The communication board will promote self-expression of basic needs. Additionally, the lift will assist her mother and attendant in transfers as She'Kenya grows.

*Drug/Supply Needs, $19,670.00.* She'Kenya is currently taking Tegretol to control seizures. She also uses Colace as a stool softener. She requires the use of diapers because of incontinence. It seems unlikely that she will ever be able to be toilet trained and the dosages of the aforementioned medication will probably increase as she grows older.

*Future Medical Care, $44,985.00.* She'Kenya will require blood work, CBC, and liver function tests to monitor for adverse side effects of Tegretol. Moreover, because She'Kenya is prone to urinary tract infections, regular urinalysis screening are also needed.

■ *Leisure/Recreational Equipment, $11,012.00.* The Special Master's recommendation, although not broken down into categories, apparently includes an award of $11,012.00 for the "Leisure/Recreational Equipment", included in She'Kenya's Life Care Plan and the annuitist's figures, projected from the Life Care Plan. The respondent takes issue with this portion of

the compensation award on the grounds that the title of the category under which it was awarded does not fall within those for which respondent argues compensation is specifically permitted by the Vaccine Act. The court rejects respondent's objections as overly legalistic and as an attempt to place form over substance.

Due to She'Kenya's physical, cognitive, and visual impairments, she has little opportunity to experience or enjoy activities which may for some be deemed leisure activities. In She'Kenya's condition, activities such as swinging on a swing, riding a tricycle or swaying to music, take on a new meaning. While from a normal child's eyes these activities may be considered play, from a medical perspective, in cases such as She'Kenya's, this equipment and these activities have an extremely high occupational and physical therapeutic value.

Some 60 years ago Judge Learned Hand stated what this court regards as sage guidance to any court, especially when dealing with human issues and the law:

> The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove themselves incapable of dealing with activities if it were so, for there is no surer sign of a feeble and fumbling law than timidity in penetrating the form to the substance.

*Loubriel v. United States,* 9 F.2d 807, 808 (2d Cir.1926). Whether or not to award the $11,012.00 included in petitioners request for leisure and recreational equipment does in fact force the court to inquire into the difference between labels or captions (form) or the real purpose of such equipment under such labels or captions (substance).

The Vaccine Act permits compensation for unreimbursable expenses which:

> have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling,

*emotional or behavioral therapy,* residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

(Emphasis added). 42 U.S.C.A. § 300aa–15(a)(1)(A)(iii)(II) (West Supp. 1989), as made applicable to retroactive cases by 42 U.S.C.A. § 300aa–15(b) (West Supp.1989).

The petitioner, has indeed presented evidence, which remains in the record unrefuted by the respondent, that the items included under "leisure/recreational equipment" in the Life Care Plan are therapeutic in nature, as well as necessary to encourage She'Kenya's further development. Testimony taken from Dr. David C. Abramson, at a deposition on May 29, 1989, was introduced at the hearing which indicated:

> They [the Clarks] will need to have the equipment necessary for other ongoing occupational and physical therapy. That will be things like *swings and other apparatuses* that can be used as crawlers. For now, we can get her into a quadruped stance. We will need what we call a bentral support crawler for her and that will help her develop use of her arms so that might be useful for her self feeding.

(Emphasis added). This unrefuted evidence demonstrates that "swings and other apparatuses" can be used for "behavioral therapy". Furthermore, at the same hearing, a video-tape, made during an evaluation session of She'Kenya Clark, was introduced as a medical record. This court reviewed the video-tape on which an employee of Dr. Abramson's discussed the beneficial use of such items as swings with presumably, Ms. Clark. The following dialogue was recorded on the tape:

> Medical Evaluator: Does she do a lot of bouncing and spinning and rocking and swinging?
>
> A: (probably Ms Clark) She do rocking every now and then, but not a lot.
>
> Medical Evaluator: Do they put her on a swing? That would help her a lot. I'm going to write you a program.
>
> . . .
>
> Medical Evaluator: A lot of that's just integrating her body. Swinging and

bouncing would help her a lot.... she needs a lot of that input to get her brain together....

The respondent in this case would have this court simply look to headings of the Life Care Plan to see if a particular heading is listed in the Act, and then superficially decide if an award for the items under the heading can be made. While this may be the easiest approach, and the Act does not specifically list "leisure/recreational equipment" as a separate category, such an approach does not comport with the spirit of the Act, with the evidence submitted to the court, or with the testimony introduced at the hearing before the Special Master. Although the respondent has objected to an award for equipment, placed under the heading "leisure/recreational equipment," the respondent has simply raised the issue as a legal assertion and has failed to present evidence to show that the equipment is not intended for therapeutic use. The real question is not what the heading states, but whether or not the items included under the heading, are compensable under the Act. The evidence in the instant case supports the Special Master's Report and Recommendation, which provides for compensation for the following aids: adapted swing, adapted tricycle, tumbleforms, jetmobile, environmental control switch for toys, adapted switch controlled toys, stereo with tape player and musical tapes, although listed under the heading "leisure/recreational equipment".

*Potential Complication (Hospital), $192,503.00.* She'Kenya due to her condition, can expect to require treatment for: seizure control; respiratory infections; urinary tract infections; ear infections and surgery to replace the tubes in her ears.

The most common complications which occur in persons with developmental disabilities are respiratory and urinary tract infections. She'Kenya has a history of ear infections and has had tubes placed in her ears, which may cause problems in the future. The occurrence of future problems can be controlled through comprehensive preventative care. The frequency and cost of treating any number of potential complications, however, cannot be predicted for the future with mathematical certainty. However, it is more likely than not that such complications will manifest themselves in the years ahead. Therefore, the court considers such expenses as medical expenses She'Kenya will encounter, and for which an award should be made.

*Cost of Institutional Care, $1,242,-445.00.*[10] Home care is strongly recommended for She'Kenya at least until the age of twenty-one (21). After She'Kenya reaches twenty-one (21), two possible scenarios present themselves. First, is home care. Home care would require a twenty-four hour attendant to meet She'Kenya's daily care needs, a housekeeper, a home/yard maintenance worker, transportation and suitable housing, to allow She'Kenya to live independently of her mother. The second and, based upon the testimony of Dr. Abramson and Ms. Edwards, the most beneficial to She'Kenya, after age 21, is the option of placing her in a private or public intermediate care facility for the mentally retarded (ICF–MR). The rate included is the cost the facility would charge for a private patient for room and board, and for some basic services and equipment.[11]

10. Since the court believes, based on the evidence submitted by the petitioner, that institutional care is the most appropriate care available for She'Kenya Clark, after the age of 21, the compensation for transportation and home care, as provided for in the Life Care Plan are not items for which compensation should be awarded. This scenario, as projected by the court at this time, is based on the best evidence currently available. Should She'Kenya's condition change and an alternative plan becomes more advisable, this Order specifically does not mandate exactly how the total compensation award must be spent. Discretion is left in the petitioner's guardian to allocate the award monies over the course of She'Kenya's life, in order to best meet her needs. By the same token, the compensation award is final and will not be adjusted to meet changing needs.

11. The services and equipment likely provided by the facility (transportation, nutritional evaluation, exercise mat and table, and Hoyer lift and replacement) have been subtracted from the total identified services and equipment.

**2. *Loss of Earnings, Pain and Suffering, and Attorneys' Fees and Other Costs, $30,000.00***

In his Report and Recommendation, the Special Master recommended: $92,-699.00 for loss of earnings under 42 U.S.C.A. § 300aa–15(a)(3)(B) (West Supp.1988) $38,338.00 for reasonable attorneys' fees under 42 U.S.C.A. § 300aa–15(e) (West Supp.1988); and $18,468.00 for other costs under 42 U.S.C.A. § 300aa–15(e) (West Supp.1988).[12] In arriving at these figures, the Special Master interpreted the phrase "may not exceed $30,000", included in 42 U.S.C.A. § 300aa–15(b) (West Supp.1988) by concluding that the Congress did not intend to include all pain and suffering, loss of earnings or the total attorney fees within the $30,000.00 limit. In his Report, the Special Master states, "The statute already applies a limit to pain and suffering in a separate section which focused on that element". Further, the Special Master concluded that the award of attorneys' fees under section 42 U.S.C.A. § 300aa–15(e) (West Supp.1988) strongly suggests Congress could not or should not have intended to limit such fees by virtue of section 300aa–15(b). Finally, the Special Master seems to conclude that Congress, by using the words "and included as attorneys' fees", limited the application of the cap only to those attorneys' fees attributed to proving impaired wages and pain and suffering.

One of the respondent's objections to the Special Master's Report and Recommendation, filed with this court, relates to the Special Master's interpretation of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989). Respondent alleges, contrary to the Special Master's finding, that 42 U.S.C.A. § 300aa–15(b) was intended to place a $30,000.00 limitation on the total award of pain suffering, impaired earnings, attorneys' fees and other costs in retroactive cases. On the other hand, the petitioner and the Special Master do not view the $30,000.00 ceiling as limiting either the total amount of compensation available under paragraphs (3) and (4) of 42 U.S.C.A. § 300aa–15(a) (West Supp.1989) or attorneys' fees and other costs.

After reviewing the submissions of the parties, the Special Master's Report and Recommendation, the Act itself, the relevant precedent, as well as the presentations made by both parties at the oral argument to this Judge on October 31, 1989, this court finds that the $30,000.00 figure listed in 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) is a congressionally imposed limitation on the total award of pain and suffering, impaired earnings and attorneys' fees and other costs.

Although the court may be sympathetic to the real world problems associated with such a conclusion, it is not for this court, or for any other court, to redefine the statutory language applicable to retroactive cases, which is clear on its face. *See e.g., Pennsylvania v. Union Gas Co.,* — U.S. ——, 109 S.Ct. 2273, 2293–96, 105 L.Ed.2d 1 (1989); *Sec. Indus. Ass'n v. Bd of Governors,* 468 U.S. 137, 153, 104 S.Ct. 2979, 2987–88, 82 L.Ed.2d 107 (1984). We agree with Justice Douglas, who stated: "We do not sit as a super-legislature to determine the wisdom, need and propriety of laws that touch economic problems, business affairs or social conditions." *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). It may be true that attorneys who conscientiously represent their clients in retroactive cases, some of whom already may have expended time and money to represent these same petitioners in other courts before filing in this court, may be forced to forgive part of the payments properly due them and/or to choose, together with their clients, whether monies awarded under the $30,000.00 limit should go first to the injured child or to the attorney. If after additional vaccine cases have gone through the courts, pursuant to the Vaccine Act, experience teaches us that a problem exists, it will be up to the Congress to formulate a solution.

---

**12.** The Special Master determined that without evidence of actual or projected experiences in the record to support a finding of compensation for pain and suffering, an award for such should not be made.

It is well settled law that "the starting point in every case involving construction of a statute is the language itself." *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981), (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975)). Moreover, it must be assumed that the ordinary meaning of that language accurately expresses the legislative purpose, *Park'N Fly v. Dollar Park and Fly, Inc,* 469 U.S. 189, 194, 105 S.Ct. 658, 661–62, 83 L.Ed.2d 582 (1985). *See also United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). Otherwise stated, "it is well-recognized that the goal of statutory interpretation is to effectuate as nearly as possible the will of the legislature." *New Mexico v. United States,* 831 F.2d 265, 267 (Fed.Cir.1987), (citing *HCSC–Laundry v. United States,* 450 U.S. 1, 6–8, 101 S.Ct. 836, 838–40, 67 L.Ed.2d 1 (1981)); *Central Tablet Mfg. v. United States,* 417 U.S. 673, 689–91, 94 S.Ct. 2516, 2525–26, 41 L.Ed.2d 398 (1974); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–49, 60 S.Ct. 1059, 1063–67, 84 L.Ed. 1345 (1940)).

The statutory provision at issue in the case at bar is 42 U.S.C.A. § 300aa–15(b) (West Supp.1989). As originally enacted, this provision stated:

(b) Vaccines Administered Before the Effective Date. Compensation awarded under the Program to a petitioner ... for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subtitle *shall only include the compensation described in paragraphs (1)(A) and (2) of subsection (a).*

(Emphasis added). The National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3768 (1986) (prior to the 1987 amendment). The compensation referred to in paragraphs (1)(A) and (2) of subsection (a) includes prospective, unreimbursable medical expenses from the date of judgment and an award of $250,000.00 in the event of a vaccine-related death.

In 1987, this statutory provision was amended by the Omnibus Budget Reconciliation Act.[13] The amendment deleted the underlined portion quoted above and added additional language. The provision, as amended, and as it is now effective with parenthetical explanations provided by the court, reads:

(b) Vaccines administered before effective date.

Compensation awarded under the Program to a petitioner under § 300aa–11 [concerning the requirement of a petition] of this table for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(B) of subsection (a) [actual unreimbursable expenses incurred before the date of judgment] ... and may include attorneys' fees and other costs included in a judgement under subsection (e) [attorneys' fees] of this section, except that the total amount that may be paid as compensation under paragraphs (3) [concerning loss of earnings] and (4) [concerning pain and suffering] of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.

■ This court finds that the plain meaning of the last clause of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) is that in retrospective, vaccine injury cases, a petitioner who meets the eligibility criteria, may be reimbursed for actual unreimbursed medical and rehabilitative expenses, as well as, up to but not more than, a total of $30,000.00, representing all the following categories: pain and suffering, impaired wages, and attorneys' fees and other costs. Specifically, in the third clause, the use of the phrase "the total amount that may be paid" clearly was intended to refer to a compilation of distinct amounts to be defined later in the clause. Furthermore, the $30,000.00 limitation encompasses all attorneys' fees and costs which may be made as part of the total compensation award. Respondent's interpretation is the

---

**13.** Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 (1987).

more plausible, given the words of the statute, which seem to require the totaling together of the distinct amounts, up to a maximum of $30,000.00, "paid as compensation under paragraphs (3) and (4) of subsection (a) of this section *and* included as attorneys' fees and other costs under subsection (e) of this section." Under this interpretation, the "and" would serve as a coordinating conjunction, linking together the description of one amount with a distinct second amount, both of which then combine to form the "total amount." *See, Mikulich v. Secretary of the Dep't of Health and Human Services*, 18 Cl.Ct 253 (1989).

Although this court finds that the statutory language at issue is clear on its face, assuming, for arguments sake, that an ambiguity could be found in the words of the statute, as enacted, resort could be had to the legislative history in order to clear up the ambiguity. The 1987 amendment was adopted as part of a massive Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330. The respondent has cited as supportive of its position a report of the committee on the Budget of the House of Representatives, H.R.Rep. No. 391, 100th Cong., 1st Sess. 690 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–364, 367 and 371.

Initially, under the heading "Purpose and Summary," the committee report states that "[t]he legislation would amend the National Childhood Vaccine Compensation Act ... to limit compensation awards." H.R. Rep. No. 391(I), 100th Cong., 1st Sess. 690 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–364. If we were to adopt the petitioner's interpretation, authorizing unlimited compensation under paragraphs (3) and (4), plus related attorneys' fees and other costs, the effect could be to expand significantly the awards available in retroactive cases, rather than to limit them, as appears to have been Congress' intent. Respondent's proposed interpretation is more consistent with the legislative intent to "limit compensation awards" to

the extent that it places section 300aa–15(e) attorneys' fees and other costs under a ceiling, not present in the Act as originally enacted.

Furthermore, letters from the Acting Director of the Congressional Budget Office, as well as from Congressmen Dingell and Waxman support the respondent's interpretation of the 1987 amendment. First, the Committee report contains an October 15, 1987 letter from the Acting Director of the Congressional Budget Office, which states, "Although the types of compensation payable would be expanded under the bill, a limit of $30,000.00 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering." H.R. Rep. No. 391(I), 100th Cong., 1st Sess. 693 (1987) *reprinted in* 1987 U.S.Code Cong. & Admin.News at 2313–367. Presumably, if the Acting Director had wanted to suggest that the limitation applied only to attorneys' fees associated with demonstrating income loss and pain and suffering, he would not have referred to "the total of payments for income loss, attorneys' fees *and* pain and suffering." Emphasis added. *Id.* Second, on September 22, 1987, Congressmen Dingell and Waxman wrote to the committee on Ways and Means suggesting ways to reduce the costs of funding the Vaccine Injury Compensation Program. One of the methods of reducing the cost of funding the Act, specifically suggested by Congressmen Dingell and Waxman, included limiting attorneys' fees.[14]

Finally, the section-by-section analysis in the committee report supports the respondent's interpretation:

> The amendments also authorize payment for lost earnings and pain and suffering, but limit the amount of payment that can be made for all compensation except future medical expenses to a total of as much as $30,000, depending upon demonstrated need and particular circumstances. The compensation for these items as it finds appropriate in each individual case.

---

**14.** Referenced in a letter from Secretary of Health and Human Services, October 8, 1987

*reprinted in* 1987 U.S.Code Cong. and Ad. News 2313–374.

H.R.Rep. No. 391(I), 100th Cong. 1st Sess. 697–698 (1987) *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–371 to 372. It is clear, therefore, that not only is the language of the statute clear, but a reading of the legislative history also supports the respondent's interpretation of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989), limiting pain and suffering, impaired earnings, and attorneys' fees and other costs to $30,-000.00. It remains, therefore, for the court, later in the damages section of this opinion, to review petitioner's specific claims for reimbursement for loss of earnings, pain and suffering and attorney fees and other costs. It is clear, however, that an award for these items should not exceed a total of $30,000.00.

As discussed above, in retrospective cases, the court is limited in the amount it can award for loss of income, pain and suffering, and attorneys' fees and other costs. 42 U.S.C.A. § 300aa–15(b) (West Supp.1989). In the present case, loss of earnings, alone, or each of the other categories in this section could easily exceed the $30,000.00 cap, put in place by the statute. In emotionally compelling cases, such as the instant one, it becomes a difficult issue as how to divide the $30,000.00 between the petitioner and counsel. One recently decided, Vaccine Act case held: awards for loss of future wages and for pain and suffering, although merited, should not be permitted to reduce attorneys' fees to an unreasonable amount. *Reddish v. Secretary of the Dep't of Health and Human Services,* 18 Cl.Ct. 366, 378 (1989). It is in the public's interest to encourage attorneys to accept vaccine-injury cases by assuring a reasonable attorney fee.

In order to compute the amount of attorney's fees to be awarded, this court, like others before it, determines that the appropriate method for computation is the "lodestar" model. *See Gregson v. Secretary of the Dep't of Health and Human Services,* 17 Cl.Ct. 19 (1989). The lodestar is the product of the reasonable hours expended, times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

The fee applicant carries the burden of proof. To meet such a burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As stated in *Martin v. United States:*

A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States,* 12 Cl.Ct. 223, 227 (1987), (*citing, Hensley v. Eckerhart,* 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943–44 (1983)).

Counsel for petitioner has submitted a petition for attorneys' fees and costs which consists of the following time and expenses:

| J.R. Neal | 138.45hrs | Partner | $292.30/hr | $40,468.94 | |
|---|---|---|---|---|---|
| M.W. Skeen | 128.25hrs | Partner | $292.30/hr | $37,487.48 | |
| J.E. Boone | 41.2 hrs | | $292.30/hr | $12,042.76 | |
| | 307.90 | | | $89,999.17 | 15 |
| Expenses | | | | $18,468.45 | |
| Total Fees and Expenses | | | | $108,467.62 | |

*Loss of Earnings.* The Vaccine Act permits an award for loss of earnings, pain and suffering and attorneys' fees and other costs. Dr. Sink's report and Dr. Abramson's testimony presents persuasive evidence that, for a host of reasons, She'Kenya Clark can anticipate reduced lifetime earnings. In fact, Dr. Abramson was quite certain that She'Kenya "will not be able to be employed in the sheltered workshop set-

---

**15.** The petitioner requests $90,000.00 for attorneys' fees for 307.90 hours. Performing the proper calculation to arrive at the cost per hour and then calculating that by petitioners total number of hours expended accounts for $.83 difference.

ting," not to mention the regular workforce.[16]

As clearly spelled out previously, based upon the plain meaning of the Act, as well as the legislative history, Congress clearly meant to limit the amount of compensation for loss of earnings, pain and suffering, and attorneys' fees and other costs to $30,000.00. It is not for this court to side-step the clear intent of Congress in order to avoid the painstaking task of reducing the compensation request for loss of earnings, pain and suffering, and attorneys' fees and other costs to fit within the statute's $30,000.00 limit. Based on the evidence presented, the court awards the maximum amount permitted by the act, $30,000.00.[17] The court will leave to the petitioner and to petitioner's counsel the unpleasant task of dividing the $30,000.00 between them.

### 3. Statutory Off-Set

▮▮ Regarding a possible off-set against a compensation award which might be required under 42 U.S.C.A. § 300aa–15(g) (West Supp.1989), the Special Master evaluated the evidence, or more accurately the lack thereof, and determined that an off-set in this case was not supported by the evidence. The Special Master concluded, based upon a finding that no evidence exists of primarily liable payors and providers, and that there was insufficient evidence of coverage, certain enough for him to reduce the compensation award.

In Respondent's Objection to the Special Master's Report and Recommendation, the respondent argued that the "Special Master fails to identify the amounts which petitioner could reasonably be expected to receive under 15(g) and does not reduce compensation awarded under section 15(a)(1)(A)." The respondent, however does not present any factual evidence to support its position. The respondent's, double spaced, one and one-half (1½) page argument amounts to nothing more than speculation and conjecture regarding She'Kenya's possible eligibility for health care benefits. The respondent's presentation lacks persuasive evidentiary support and constitutes a wholly insufficient showing to meet any standard of proof that an off-set should be applied. This is especially ironic since the respondent, Secretary of Health and Human Services is also the overall director of the Medicare program. Likewise, She'Kenya Clark's eligibility for health care benefits, not available through the Department of Health and Human Services, is also not documented.

The court realizes that even if the opposition offers no evidence on a particular issue, it is still up to the trier of fact to

---

**16.** In computing the loss of earning capacity of She'Kenya Clark, Mr. Wolfe used the Sink, Caldwell & Gannaway, Inc., vocational options as well as the average annual wage shown for each alternative.

The annuity cost factors shown for each category select the cost of an annuity to pay the average yearly wage for each option for the worklife duration figures obtained from the U.S. Dept. of Labor, Bureau Of Statistics, compiled as of September 1985. Such figures illustrate the average number of remaining years of labor force participation. They are used to provide a measure of the number of years the individual would have actually worked prior to final retirement.

In each of the vocational alternatives, a rate of annual wage increase as reflected in each option has been assumed. Since the Sink, Caldwell report provided no projections in this area, the court has adopted the assumption made by Mr. Wolfe and accepted by the Special Master which the respondent, by its failure to object appears to have accepted.

The annuity cost factors assume an annual income would not begin until the educational requirements have been completed, i.e. 18, 20 and 22 respectively.

VOCATIONAL ALTERNATIVES
1. HIGH SCHOOL GRADUATE

| | | |
|---|---|---|
| Yearly Wage Average | — | $9,878 |
| Assumed Annual Increase | — | 3% |
| Worklife Duration | — | 28.8 years |
| Annuity Cost | — | $92,699 |

2. TWO YEAR TECHNICAL SCHOOL GRADUATE

| | | |
|---|---|---|
| Yearly Wage Average | — | $11,779 |
| Assumed Annual Increase | — | 4% |
| Worklife Duration | — | 27.1 years |
| Annuity Cost | — | $118,868 |

3. FOUR YEAR COLLEGE GRADUATE

| | | |
|---|---|---|
| Yearly Wage Average | — | $22,104 |
| Assumed Annual Increase | — | 5% |
| Worklife Duration | — | 26.1 years |
| Annuity Cost | — | $239,411 |

**17.** It thus becomes unnecessary to consider the reasonableness of the time expenditures and rates of Mr. Neal, Mr. Steen, or Mr. Boone.

assess the credibility of testimony on that issue and to decide whether or not it is believable. *Robinson v. United States*, 718 F.2d 336, 339 (10th Cir.1983) (citing McCormick, *Evidence* 794 (1972)). In the case at bar, the petitioner has successfully carried the day by presenting evidence that meets or exceeds the burden placed upon them by the statute in terms of an off-set. The petitioner, pursuant to the June 23, 1989 order, issued by the Special Master, submitted the annuitist report of Bruce Wolfe which considered the issue of off-set. For the most part, Mr. Wolfe's report failed to reach a definitive conclusion that the petitioner would qualify for a form of supplemental insurance Mr. Wolfe stated:

Finally, I have made no consideration for the offset required by the Vaccine Statute for the primary source payments for care and medical attention which would be available or reasonably be expected to be available under government programs such as Title XIX of the Social Security Act (for adult expenses) or the 2176 Model Waiver Program (for childhood expenses). A Model Waiver Program may be available in Georgia. These programs, "are a separate category of 2176 waivers created by the Health Care Financing Administration to deal with an eligibility problem faced by certain disabled persons, chiefly children. If a child lives at home, the parents' financial resources are deemed to be available for the child's medical care. If the same child is institutionalized, after the first month away from home only the child's own financial resources are deemed to be available for the child's care. The child may then qualify for Medicaid. Because of these "deeming" rules, some children who could have been cared for at home might remain in institutions because, if they were to return home, they would lose Medicaid." Further, the Education of All Handicapped

Children Act, provides for significant therapy allowances which would offset a great deal of the need suggested by the Sink, Caldwell report.

(Footnotes omitted).

On November 7, 1989, pursuant to the court's Order at the October 27, 1989 oral argument, the respondent again addressed the issue of off-set under 42 U.S.C.A. § 300aa–15(g). The court's October 27, 1989 Order requested the respondent to address the following two (2) issues:

1. Supply the court with any and all information you may possess or ultimately locate which supports your position on the issue of set-off under 42 U.S.C.A. § 300aa–15(g).

2. If it should be determined that the petitioner will be eligible for any insurance program, such as Medicaid, the dollar amount of a projected off-set, in present value, 42 U.S.C.A. § 300aa–15(g).

The respondent filed a two (2) page memorandum along with an affidavit from Gemma Flamberg, an attorney employed by the Office of General Counsel of the Department of Health and Human Services.

In responding to the court's Order, the respondent divided She'Kenya's eligibility for receiving supplemental insurance benefits into two stages: before eighteen (18) years of age and after eighteen (18) years of age. Initially, the respondent in its memorandum concedes that, "we are unable to make a determination regarding She'Kenya's eligibility for Medicaid prior to reaching age eighteen. Such a determination is contingent on the financial resources available to her guardian. The respondent does not have access to this information."[18] The affidavit of Gemma Flamberg also stated, "Accordingly, as long as She'Kenya is a minor, we are unable to determine if she is eligible for SSI or Medicaid." Based on the respondent's own

---

**18.** The court questions the respondents rational for not being able to make an assessment as to She'Kenya's eligibility for Medicaid prior to reaching eighteen (18) years of age because they (respondent) do not possess the necessary information. The respondent's counsel in this case, made a conscious decision to have limited participation in this case, the respondent has stretched the notion of fair play by now contending that it cannot fully address the issues that they raised to the Special Master's Report and Recommendation due to lack of *"access* to the information".

admissions, this court has no other alternative but to conclude that the respondent has failed to prove by any known evidentiary standard that She'Kenya Clark is or will be definitely eligible for any insurance benefits prior to reaching the age of eighteen (18).

As for any certainty that She'Kenya will be eligible for insurance benefits after reaching the age of eighteen (18), the respondent does not present any evidence to support a position that such will happen. In fact, the affidavit accompanying the respondent's memorandum and in support thereof states: "Thus, we are unable to provide the court with a conclusive determination of petitioner's Medicaid entitlement or level of benefits, since to our knowledge, the petitioner has never applied for Medicaid coverage. We note, further, that Medicaid's eligibility requirements and scope of coverage are subject to change." The best the respondent can offer in support of its position is to assume that She'Kenya will meet Medicaid's resource eligibility requirements. Finally, the respondent, states that they are "unable to give the court an exact number by which to off-set compensation."

Without more exacting evidence, making it more likely than not that the petitioner would be eligible for supplemental insurance, the court must conclude that the petitioner's uncontested evidence, which suggests that the petitioner may not be eligible for any form of supplemental insurance is persuasive. Therefore, respondent's request for an off-set amount from the compensation award, under section 2115(g) of the Act, is denied.

■ Accordingly, the court orders the respondent, Secretary of the Department of Health and Human Services, to compensate the petitioner, She'Kenya Clark, in the amount of $2,802,855.00. In compliance with the statute, the award shall be paid in four equal parts. Any division of monies awarded under the $30,000.00 limit for loss. of earnings, pain and suffering, and attorneys' fees and other costs, shall be made by the petitioner and petitioner's counsel, after the receipt of the each of the four annual installments.

IT IS SO ORDERED.