**Ronald Dean MORRIS, Sr. and Mary L. Morris, as legal representatives of the Estate of Ronald Dean Morris, Jr., deceased, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 89–17V.

United States Claims Court.

March 22, 1990.

Andrew W. Dodd, Torrance, Cal., for petitioners.

John Lodge Euler, Deputy Director, Torts Branch, with whom was Stuart E. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, and Barbara Hudson, Office of Gen. Counsel, Dept. of Health and Human Services, Washington, D.C., for respondent.

OPINION [1]

HORN, Judge.

This is an action for compensation for a vaccine related injury to petitioners' child, Ronald Dean Morris, Jr., brought by his parents, Ronald Dean Morris, Sr., and Mary L. Morris, under the National Childhood Vaccine Injury Act of 1986. Pub.L. No. 99–660, 100 Stat. 3755, *as amended by* several public laws codified in 42 U.S.C.A. §§ 300aa–1 to 300aa–34 (West Supp.1989) (hereinafter Vaccine Act).[2] On October 30, 1989, Special Master Paul T. Baird submitted his Report and Recommendation in the above-captioned case to the Honorable Judge John Napier. The case was reassigned to this Judge on November 28, 1989, after the resignation of Judge Napier.

The case is before the court on the Special Master's Report and Recommendation and "Respondent's Objection to the Report and Recommendation for Judgment." The respondent objects to those portions of the

---

1. This decision may contain information which may not be disclosed to a nonparty. *See* 42 U.S.C.A. § 300aa–12 (West Supp.1989). Accordingly, within fourteen (14) days of the date of filing this decision, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If there are no objections filed within the fourteen (14) day period, then it shall be deemed that this report does not contain material subject to section 300aa–12.

2. The court is cognizant of the fact that the National Childhood Vaccine Injury Act was added to and amended by the Omnibus Budget Reconciliation Act of 1989, Pub.L. 101–239, 103 Stat. 2106. Since the aforementioned amendment was not in effect when this case was filed with the court, 42 U.S.C.A. §§ 300aa–1 to 300aa–34 (West Supp.1989) remains the controlling law in the case at bar.

Special Master's Report and Recommendation which interpreted the provisions and award made pursuant to 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) for attorneys' fees and other costs. The petitioner has not filed an objection to the Special Master's Report and Recommendation.

Jurisdiction for the case is vested in the United States Claims Court under the Vaccine Act, 42 U.S.C.A. § 300aa–12(a) to (d) (West Supp.1989) and pursuant to United States Claims Court General Order No. 23, published on January 25, 1989.

After consideration of the submissions of the parties and the Report and Recommendation filed by the Special Master, this court finds that the Special Master correctly found that the petitioners have demonstrated, by a preponderance of the evidence, that Ronald Dean Morris, Jr. died as a result of the administration of a vaccine covered by the Vaccine Act and meets the eligibility standards for compensation under the Vaccine Act. The court declines to enter the judgment as a default judgment. The uncontested evidence presented is sufficient to establish the vaccine inoculation as the cause of Ronald Jr.'s death and to make the petitioners eligible for compensation under the Vaccine Act. Moreover, this court rejects the Special Master's recommendation of $52,910.07 in attorneys' fees and other costs and finds that 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) provides that the award for pain and suffering, loss of future earnings, and attorneys' fees and other costs is to be limited to $30,000.00, in total, for prior litigation, as well as for the action filed in the United States Claims Court. Petitioners, therefore, are awarded $250,000.00 for the death of Ronald Dean Morris Jr., petitioners' son, and $30,000.00 for attorneys' fees and other costs.

## BACKGROUND

After the petition was filed the case was assigned to Judge John Napier. The respondent filed a Notice of Appearance, on March 8, 1989. In accordance with the Vaccine Rules of the United States Claims Court, the Special Master ordered a settlement conference. In response, on March

20, 1989, the respondent filed a Motion to Suspend Proceedings for 30 days, pursuant to General Order 24 of the United States Claims Court, to "determine if the jurisdictional requirements of the National Childhood Vaccine Injury Act of 1986, as amended, have been met." On March 22, 1989 the Special Master entered an Order granting the 30 day suspension.

After the 30 days had lapsed, on April 27, 1989, the respondent filed another Motion to Suspend Proceedings for 90 days in this and every other case filed under the National Vaccine Injury Compensation Act. In addition, counsel for respondent indicated "that further participation by counsel will be limited." Attached to the Motion was a letter to the Chief Judge of the United States Claims Court, from the Deputy Assistant Attorney General, which indicated:

> [T]he confluence of unrealistic time requirements for processing cases plus the adoption of traditional litigation modes of resolution by the court have overwhelmed our attorneys and place them and HHS medical professionals in a position from which they are unable to make any meaningful contribution to a just resolution of the cases. In our view, the situation is so serious that it has placed the integrity of the decision-making process in serious jeopardy.

Due to the uniqueness of the respondent's motion in terms of suspending all cases filed under the National Childhood Vaccine Act, the Chief Judge heard oral argument on the Motion. On May 16, 1989, he issued an Opinion denying the respondent's Motion and ordered the respondent to clarify its role as counsel in the vaccine cases before the court. *Morris, et al. v. Secretary of the Department of Health and Human Services*, No. 88–44–V (May 16, 1989). In so holding, the court reasoned:

> While the court sympathizes with respondent's recitation of the problems resulting from a confluence of pressures— the Vaccine's Act 365–day decision timeframe, respondent's lack of resources and the procedures for determining en-

titlement to compensation under the Vaccine Act—the court is convinced that it is respondent's (both the Department of Justice and the Department of Health and Human Services) lack of resources that has precipitated respondent's extraordinary request to suspend all vaccine cases. However, the government's lack of resources cannot be allowed to penalize petitioners. When the United States undertakes a statutory program, this court must presume that it has the minimal resources required to carry-out the statute.

*Id.* at 6. The court also stated that: "However, while any court would hopefully consider a party's occasional request, from either petitioner or respondent, for relief from a scheduling or filing conflict, to tailor the entire procedural process around one side's lack of resources would make a mockery of the judicial process". *Id.* at 10. Additionally, the court recognized that in the alternative to a full hearing, the Vaccine Act is sufficiently flexible to permit informal settlement procedures and "in fact, they are greatly encouraged." *Id.* at 14.

On May 26, 1989, the United States Department of Justice, on behalf of the respondent, filed its Notice of Withdrawal and also, in reply to Chief Judge Smith's Opinion and Order, filed its answers to a series of questions posed at the conclusion of the Order, as follows:

(1) Given the current status of the resources available to the Department of Justice and the Department of Health and Human Services, full participation as currently envisioned by the Court in this case and the remaining cases filed under the National Vaccine Injury Compensation Program is not possible. Regretfully, the Department of Justice has no option but to withdraw from participating in cases under the Program until such time as circumstances permit. Accordingly, in those cases in which a Department of Justice attorney is currently designated, a formal notice of withdrawal will be filed contemporaneous with this response or shortly hereafter. In a select number of cases in which settlement is imminent, a notice of withdrawal will not be filed so that settlement may be facilitated without undue delay. (2) At this time, new Department of Justice attorneys will not be designated in cases from which an attorney has withdrawn or in which no appearance has yet been filed. The Secretary of Health and Human Services will not be entering a separate appearance in cases under the Program.

On May 22, 1984, after the Chief Judge had denied the respondent's request to suspend proceedings, the Special Master, on his own initiative, issued an Order which stated, "Respondent has not filed its answer, which was required to have been filed on May 17, 1989 ... and is therefore in technical default". The Special Master continued:

Therefore, any application for default judgment filed by petitioner must include—by way of exhibit or by specific reference to documents which have been filed with the court-affidavits and other documents sufficient to establish petitioners' right to relief and the amount of compensation to which petitioner is entitled, including costs and attorneys' fees.

Subsequently, apparently prompted by the Special Master, on July 7, 1989, petitioner filed an "Application for Recommendation of Special Master to Judge Presiding for Judgment by Default Pursuant to Vaccine Rule 55(a)." After several additional submissions, for clarification purposes, as ordered by the Special Master, the Special Master filed his Report and Recommendation for Entry of Judgment by Default on October 30, 1989.

Shortly thereafter, on November 20, 1989, respondent filed the Notice of Appearance of Barbara Hudson, attorney, Office of the General Counsel, Department of Health and Human Services. Additionally, the respondent filed its Objection to the Report and Recommendation for Judgment on the same date. The case was reassigned to this Judge on November 28, 1989 for final disposition.

## FACTS

According to the petition and the exhibits filed together with the petition, the following facts in the case have been established by the petitioner, and remain uncontested by the respondent. Ronald Jr. was born on November 8, 1984, at Fresno Community Hospital, Fresno, California, to petitioners, Ronald Dean Morris, Sr., and Mary L. Morris. A full term baby, he weighed 9 lbs. 1 oz. at birth, and had Apgar scores of 9 (after one minute) and 9 (after 5 minutes). Ronald had no apparent physical abnormalities. He was discharged on November 9, 1984, the day following his birth, in satisfactory condition.

Ronald's treating physician was Lydia F. Favor, M.D. His first visit with Dr. Favor after discharge from the hospital was a routine visit on November 12, 1984. At that time, he weighed 8 lbs. 15 oz. On subsequent visits to Dr. Favor on December 18, 1984, and January 8, 1985, Ronald weighed 11 lbs. 12 oz., and 12 lbs., 11 oz., respectively. Those visits appeared to be routine visits, and no significant problems were reported. Dr. Favor described Ronald as "alert, smiling and cooing" and a "well baby" in her notes of the January 8 visit.

Following Ronald's death on January 9, 1985, petitioners told Deputy Coroner Michael E. Thornton that other than having a slight runny nose since birth, Ronald had been a healthy baby throughout his life. Ronald's maternal grandmother, Edna Mae Whitford (hereinafter Mrs. Whitford) testified in her deposition that she saw Ronald two or three times a week or more while he was alive and had sole care of him at least once a week, and described his health as "[e]xcellent. Perfect."

It was during the January 8, 1985, visit to Dr. Favor, that Ronald was administered his first DPT shot. After leaving the doctor's office, Mrs. Morris took Ronald to see Mrs. Whitford at her place of employment, which was nearby.[3] She stayed 20 to 30 minutes. Mrs. Whitford testified that Ronald "looked pale, very drowsy" at that time and that he "couldn't be aroused." Mrs. Whitford said she didn't mention it to her daughter "because I thought there would be a little reaction from a baby having a shot then."

One of Mrs. Whitford's co-workers who saw Ronald at that time was Mary Ann Good. She described her reaction to his appearance: "[I] don't know babies. I don't even have children or anything, but my first reaction was he was slate gray. He was just really gray and his eyes were closed. His coloring was bad. And my first intuition was, 'This baby doesn't look good.'" Another co-worker, Martha Gomez, had seen Ronald on previous occasions when Mrs. Morris had brought him in. On those occasions, he looked "just like most newborns, you know." When he visited after his vaccination, he "looked kind of pale, different coloring." Additionally, Ms. Gomez indicated that on this occasion:

[H]e was more quiet than normal. Because normally he would be kind of moving his little hands and stuff. And this one particular time he was just kind of laying there real quiet. Usually he would be moving his eyes and looking around the room and stuff and he was not really up to it that one time.

Norma Keck had also seen Ronald in the office on several occasions. When he was about a month old, "[h]e was a very pretty, healthy baby." A week later he was brought in again. He looked "[t]he same— looked real good." When she saw him on the day he received his DPT inoculation, "... [h]e was gray. And I couldn't believe the color on the baby. And he was limp.... [I] took my finger and tried to lift his finger, kind of wake him up, and he tried to open his eyes, but he acted like he was real sleepy." She further stated "[a]nd then I saw his eyes roll back and I thought, my God. And that's what really floored me." She asked if he had been crying a lot—because she thought he might have been tired from crying—and was told

---

**3.** Mrs. Morris had previously been employed by the same company, Equifax, and knew many of her mother's co-workers.

that he had not. To her, Ronald looked "Dead. I mean I had been around death and that's what had happened. And that's why it frightened me so." She wanted to say something about it but was afraid she "might hurt their feelings because Mary and her mother were there and there were several other girls standing around," so she said nothing. After Mrs. Morris left, she and some of the others said, "My god. He looked gray." She also commented on his limpness and gray coloring, and the others agreed.

The final co-worker, whose deposition testimony was introduced was Sharron Vargas. She had seen Ronald in the office three to five times prior to January 8. She picked Ronald up and held him every time he was brought in. Whenever she saw him, his health was "great." She perceived Ronald as being asleep when he was brought in on January 8. She assumed that he was exhausted from crying after having received his shot. But just before he left "[h]is little arm fell, and it was just dangling." She thought: "This baby has no life in him." She touched her lips to his forehead to see if he had a fever, but he didn't. The color of his skin also caught her eye: "There was something about the color of his skin that drew me to him. I don't know how to describe it. It's like he kind of glowed or his skin was transparent, where you could see his veins and everything real good."

Later that evening, Mrs. Morris spoke to her mother by telephone and told her that Ronald was sleepy and couldn't be aroused very much, which Mrs. Morris thought was a normal shot reaction. According to the coroner's report, Ronald slept most of the day, seemed to have a diminished appetite, and developed a slight fever. Mrs. Morris fed Ronald at 3:00 a.m. on January 9, 1985. His diaper was dry, which was unusual. When Mrs. Morris awoke at 8:00 a.m., Ronald was blue and not breathing. She called her husband home from work and called her mother.

Mrs. Whitford testified that she was called at work between 8:00 a.m. and 8:30 a.m. Mrs. Morris, who was crying, told her that Ronald was dead. She went to the Morris home. Mr. Morris was already there. She went in and looked at the baby and asked if the paramedics had been called. When told that they had not been called, she called them. She then tried to revive Ronald by breathing into his mouth, he was blue, a bit warm, but it didn't do any good. Mrs. Morris told her she had tried it earlier.

Records indicate that paramedics were dispatched at 8:44 a.m. and arrived at the Morris residence three minutes later. Ronald's skin was cyanotic/dry and he was warm, but there was no pulse or respiration. They departed the residence with Ronald at 8:59 a.m., arriving at St. Agnes Hospital, Fresno, at 9:05 a.m. Enroute they administered CPR and two drugs, atropine and Epi 1:1000. Ronald was pronounced dead at 9:35 a.m.

## DISCUSSION

### DEFAULT

■ As a preliminary matter, the court rejects the Special Master's finding that a "[d]efault should be entered in favor of petitioners and against respondent." On July 7, 1989, the petitioners filed an Application for Recommendation of Special Master to Judge Presiding for Judgment by Default Pursuant to Vaccine Rule 55(a). Vaccine Rule 55(a) provides, in pertinent part, as follows:

(a) *By the Judge.* In all cases, the party entitled to a judgment by default shall, prior to the submittal of the report by the special master, apply for a recommendation to the judge therefor, ... If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing, if any, on such application. If, in order to enable the special master to enter a recommendation as to judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment

by evidence or to make an investigation of any other matter, the special master may conduct such hearings or order such references as is deemed necessary and proper.

Additionally, Vaccine Rule 55(c) provides:

(c) *Judgment Against Respondent.* No judgment by default shall be entered against the respondent unless the petitioner establishes a claim or right to relief satisfactory to the judge.

In an application under Vaccine Rule 55(c) or for the entry of a judgment by default, the judge is required to exercise judicial discretion. *See* C. Wright, *Federal Courts* § 98 at 661 (4th ed. 1983). Courts exist to do justice and are properly reluctant to lend their processes to the enforcement of an unjust judgment. *Id.* However, simultaneously therewith, the rules that require responsive pleadings within a limited time serve important social goals and a party should not be permitted to flout them with impunity. *Id.* In determining whether or not to enter a default judgment, the court is free to consider a number of factors that may appear from the record before it. C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure* § 2685 at 433 (1983) (citations omitted). Among these are: the amount of money potentially involved; whether material issues of fact or issues of substantial public importance are at issue; whether the default is largely technical; whether plaintiff has been substantially prejudiced by the delay involved; and whether the grounds for default are clearly established or are in doubt *Id.* at 423–26.

The petitioners have not alleged that they have been prejudiced by the delay. In fact, this case has moved through the court system in accordance with the statutory time schedules. Moreover, the petitioners have not raised an argument that they have been prejudiced by delay. The court, therefore, finds that the petitioners have not been substantially prejudiced by any delay.

This Judge has previously questioned and found fault with the manner in which the respondent, the Department of Health and Human Services and its attorney, the Department of Justice, have refused to participate in vaccine cases during the proceedings before the Special Masters. *See Clark v. Secretary of the Department of Health and Human Services*, 19 Cl.Ct. 113 (1989). Certainly no court should have to tolerate a unilateral decision by one party not to participate in scheduled proceedings. In the instant death case, however, in which the petitioners' counsel filed a well documented petition and detailed exhibits, which included sufficient information to prove the statutory elements necessary to warrant recovery under the Vaccine Act, the decision of the respondent not to participate in the proceedings before the Special Master probably had less of a negative impact on the prosecution of the lawsuit than in many of the vaccine cases filed in which the evidence is less clear.

In this particular case, the weight of the evidence presented to the court was sufficient to establish the cause of action and clearly entitle the victim, Ronald Dean Morris, Jr., to compensation under the Vaccine Act for a vaccine-related death. The Special Master's finding that the judgment should be entered as a default judgment was gratuitous and unnecessary. Default judgments against the sovereign should be reserved for limited use and not employed where the same result can be effected another way, as is true in the instant case.

## CAUSATION, ENTITLEMENT, AND AMOUNT OF COMPENSATION

The statutory requirements which a petitioner must demonstrate in order to be eligible for compensation under the Vaccine Act are clearly spelled out in 42 U.S. C.A. § 300aa–13 (West Supp.1989). Section 2113(a)(1) of the Vaccine Act states that compensation shall be awarded under the Program to a petitioner if the court makes the findings set out below, based on the evidence presented to the Special Master and to the court:

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

Based on the numerous submissions of the petitioners, the Special Master made the required findings, which this court adopts, as follows: It is the finding of this court that: under 42 U.S.C.A. § 300aa–11(c)(1), the petitioner has submitted the information required and has established, by a preponderance of the evidence, entitlement to an award by demonstrating that:

(1) That the petitioner received a vaccine set forth in the Vaccine Injury Table. 42 U.S.C.A. § 300aa–11(c)(1)(A) (West Supp. 1989).

In the instant case, the record as submitted, clearly demonstrates that Ronald Dean Morris, Jr. received a DPT shot, as provided for in the Vaccine Act, on January 8, 1985.

(2) That the petitioner received the vaccine in the United States or in its trust territories. 42 U.S.C.A. § 300aa–11(c)(1)(B)(i) (West Supp.1989).

In the case at bar, the record demonstrates that the vaccine was administered to Ronald Dean Morris, Jr. in Fresno, California, within the boundaries of the United States.

(3) That the petitioner sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine ..., and that the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table. 42 U.S.C.A. § 300aa–11(c)(1)(C)(i) (West Supp.1989).

The Vaccine Injury Table, included in Section 14(a) of the Vaccine Act, lists the DPT vaccine, the vaccine adminis-

tered to Ronald, Jr., as one of the covered vaccines, and also lists "shock-collapse or hypotonic-hyporesponsive collapse," the diagnosis in the instant case, as a recognized "injury, disability, illness, or condition," if the first symptom of the disorder occurred within three days after a vaccination, which occurred in this case within the required time period.

(4) That the petitioner died from the administration of the vaccine. *Id.*

Ronald died on January 9, 1985, and according to the medical testimony offered in the depositions attached to the petition, Ronald Dean Morris, Jr's death was a sequela to the hypotonic-hyporesponsive collapse, caused by the vaccine administration.

(5) That the petitioner has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death. 42 U.S.C.A. § 300aa–11(c)(1)(E) (West Supp.1989).

In the instant case, the civil action previously filed against the manufacturer of the vaccine has been dismissed and the petitioners have not previously collected an award or settlement for the vaccine related death.

(6) Finally, that petitioners, Ronald Dean Morris, Sr, and Mary L. Morris, are the duly appointed legal representatives of the estate of Ronald Dean Morris, Jr. 42 U.S.C.A. 300aa–11(b)(1)(A) (West Supp. 1989).

Here, the record demonstrates that the petitioners in this case are the proper representatives of the estate of Ronald Dean Morris, Jr., now deceased.

■ Additionally, this court agrees with the Special Master that the record fails to establish by a preponderance of the evidence that the deceased's death was caused by factors unrelated to the vaccine administered. We find this to be the case, despite the finding in the autopsy report, which listed the cause of death as "sudden infant death syndrome" (SIDS).[4] The court's re-

---

**4.** SIDS is defined in Dorland's Illustrated Medical Dictionary (27th ed. 1988) at 1644–45 as "the

sudden and unexplained death of an apparently healthy infant, typically occurring between the

jection of SIDS as the cause of death is based on the testimony of John H. Menkes, M.D. and Dr. William Cox, M.D.[5] After reviewing Ronald's medical records, Dr. Menkes stated that it was his opinion "based on reasonable medical probability" that Ronald's death "was medically caused by the DPT vaccine administered to him on January 8, 1985, and that Ronald suffered from a hypotensive hyporesponsive episode, medically related to his D.P.T. immunization ..., an event which forms a portion of, and is medically related to, the chain of events caused by [the] immunization ultimately leading to" his death.[6]

William A. Cox, M.D. also reviewed Ronald's medical records, including autopsy slides. It was his opinion, "based on reasonable medical certainty," that Ronald's death "was medically caused by immunization with D.P.T. vaccine on January 8, 1985," and that the classification of SIDS as the cause of death was in error. If the death had occurred in Summit County, Ohio, he would have "reported said death as caused by the pertussis component of the D.P.T. vaccine...."

The uncontested testimony satisfies the requirement of section 2113(a)(1) of the Vaccine Act that the court may award compensation only if a petitioners' claims are substantiated by medical records or medical opinion. Ronald clearly displayed

symptoms of hypotonic-hyporesponsive collapse between the time of his vaccination and his death. SIDS is an appropriate diagnosis only when it applies to the death of "an apparently healthy" infant. Note 4, *supra*. Based on eyewitness testimony, Ronald suffered a clear decline following the administration of the DPT vaccine and, according to the deposition testimony offered into evidence, did not appear healthy during the day preceding his death. Moreover, there was no evidence that Ronald's death was due to factors unrelated to the administration of the DPT vaccine on January 8, 1985.[7]

■ Having satisfied each of the required tests listed in the Vaccine Act, by a preponderance of the evidence, that their son, Ronald, Jr., died a vaccine-related death, and having satisfied the court that the petitioner's death was not brought about by factors unrelated to the administration of the vaccine 42 U.S.C.A. § 300aa–13(a)(1)(B) (West Supp.1989); the petitioners in the instant case are entitled to an award of compensation under the Vaccine Act. Section 2115(a)(2) of the Vaccine Act provides for a fixed award of $250,000.00 in the event of a vaccine-related death. Moreover, the petitioners Ronald Dean Morris, Sr. and Mary L. Morris, who have demonstrated they are the duly appointed personal representatives of the es-

---

ages of three weeks and five months, and not explained by careful postmortem studies." SIDS is an idiopathic diagnosis used to describe the otherwise unexplained death of an infant.

5. Dr. Menkes is a board certified pediatrician and neurologist and professor of neurology and pediatrics at the University of California, Los Angeles. He has an extensive professional record and has published over 160 articles and abstracts. The fourth edition of his book *Textbook of Child Neurology* is presently being printed.

Dr. Cox is a diplomat of the National Board of Medical Examiners and is also board certified in anatomic and clinical pathology, forensic pathology, and neuropathology. He is presently employed as a forensic pathologist and coroner for Summit County, Ohio. He serves in the following positions at Saint Thomas Hospital Medical Center, Hudson, Ohio: Director, Division of Pathology; Medical Director, School of Medical Technology; Blood Bank Director. He also has several academic positions.

The testimony of both doctors was offered in the form of deposition transcripts taken as part of earlier, civil litigation related to Ronald's death.

6. Section 2114(b)(1) of the Vaccine Act provides:

(1) A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete) hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

7. *See* section 2113(a)(1)(B) of the Vaccine Act. The autopsy diagnosis of SIDS as the cause of death does not qualify as such a factor because SIDS is an idiopathic or unexplained cause. 42 U.S.C.A. § 300aa–13(a)(2)(A).

tate of Ronald Dean Morris, Jr., therefore, are entitled to collect an award of $250,-000.00.

## ATTORNEYS' FEES AND OTHER COSTS

Petitioner has filed a request for $73,-612.82 in attorneys' fees and costs. This figure represents the total costs and attorneys' fees to which the petitioners' attorney believes he is entitled for the previous litigation, filed and dismissed prior to the time the petitioners filed the instant action in this court, as well as for attorneys' fees and costs for the current lawsuit. As is discussed below, this court finds that petitioners request is $43,612.82 in excess of the $30,000.00 which is listed in 42 U.S.C.A. § 300aa–15(b), and which this Judge has previously held should operate as a cap on the total awarded for pain and suffering, attorneys' fees and other costs in retrospective cases brought under the Vaccine Act. *See Clark v. Secretary of the Department of Health and Human Services*, 19 Cl.Ct. 113 (1989).

Notwithstanding the plain reading of the statute, petitioners argue in their submission requesting attorneys' fees, that only the attorneys' fees incurred in the present action are subject to the $30,000.00 cap. Petitioners argue further that the fees incurred in a prior civil action in the same matter are not subject to the above-mentioned monetary cap. Petitioners base their statutory interpretation on their overall reading of the Vaccine Act, and on their understanding of the legislative intent as interpretation from the legislative history of the Vaccine Act.

In his Report and Recommendation, the Special Master recommended: $48,562.50 for attorneys' fees and $4,347.57 for costs, for a total of $52,910.07. In recommending such an award, the Special Master summarized his position as follows:

[I]n considering the overall purpose of the Act, the actual wording of amended § 15(b), the context in which it became law, the awards which are otherwise available under the Act for lost income and pain and suffering, the unfairness of statutorily limiting an attorney to a fee which does not reasonably reflect the value of the time spent on the case, *see* § 15(e)(3) and the financial conflict of interest between attorney and client which would result from construing the cap broadly, the court is persuaded that the $30,000 limit of § 15(b) applies only to the total amount of attorneys' fees and costs attributable to proving the lost income and pain and suffering elements of compensation in pre-Act injury cases and, thus, is not applicable in this case.

(footnote omitted).

The respondent filed an objection to the Special Master's Report and Recommendation regarding the Special Master's interpretation of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989).[8] Respondent alleges, contrary to the Special Master's finding, that 42 U.S.C.A. § 300aa–15(b) was intended to place a $30,000.00 limitation on the total award of pain suffering, impaired earnings, attorneys' fees and other costs in retroactive cases.

After reviewing the Vaccine Act and the associated legislative history, the submissions of the parties, the Special Master's Report and Recommendation, and the existing precedent, this court finds that the $30,000.00 figure included in 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) should be read as a congressionally imposed limitation in retroactive cases on the total award of pain and suffering, impaired earnings and attorneys' fees and other costs for both the prior, related, civil action and for the action before the United States Claims Court.

---

**8.** This court certainly does not condone the attitude and behavior adopted by the United States Department of Justice not to participate in the case before the Special Master, and only to file an objection to the attorneys' fee award in this case with the Judge. Nonetheless, if this court were to find the government in default, it also, logically would have had to reject Respondents' attempt to file its objections to the Special Master's Report and Recommendation on the alleged $30,000.00 maximum reimbursement for attorney's fees and other costs and the objections should not have been included in the case file.

Although the court may be sympathetic to the real world problems associated with such a conclusion, it is not for this court, or for any other court, or adjudiciary forum, to redefine the clear statutory language, which is applicable to these retroactive cases. *See e.g., Pennsylvania v. Union Gas Co.,* —— U.S. ——, 109 S.Ct. 2273, 2293–96, 105 L.Ed.2d 1 (1989). We agree with Justice Douglas, who stated: "We do not sit as a super-legislature to determine the wisdom, need and propriety of laws that touch economic problems, business affairs or social conditions." *Griswold v. Connecticut* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); *Sec. Indus. Ass'n. v. Bd of Governors,* 468 U.S. 137, 153, 104 S.Ct. 2979, 2987, 82 L.Ed.2d 107 (1984). It may be true that attorneys who conscientiously represent their clients in retroactive cases, some of whom already may have expended time and money to represent these same petitioners in other courts before filing in this court, may be forced to forgive part of the payments properly due them and/or to choose, together with their clients, whether monies awarded under the $30,000.00 limit should go first to the client or to the attorney. If after additional vaccine cases have gone through the courts pursuant to the Vaccine Act, experience teaches us that a problem exists, it will be up to the Congress to formulate a solution.

■ It is well settled law that "the starting point in every case involving construction of a statute is the language itself." *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981), (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975)). Moreover, it must be assumed that the ordinary meaning of that language accurately expresses the legislative purpose. *Park'N Fly v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985); *see also United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). Otherwise stated, "it is well-recognized that the goal of statutory interpretation is to

effectuate as nearly as possible the will of the legislature." *New Mexico v. United States,* 831 F.2d 265, 267 (Fed.Cir.1987), (citing *HCSC–Laundry v. United States,* 450 U.S. 1, 6–8, 101 S.Ct. 836, 838–39, 67 L.Ed.2d 1 (1981)); *Central Tablet Mfg. v. United States,* 417 U.S. 673, 689–91, 94 S.Ct. 2516, 2525–26, 41 L.Ed.2d 398 (1974); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543–49, 60 S.Ct. 1059, 1063–67, 84 L.Ed. 1345 (1940).

The statutory provision at issue in the case at bar is 42 U.S.C.A. § 300aa–15(b) (West Supp.1989). As originally enacted, this provision stated:

(b) Vaccines Administered Before the Effective Date.

Compensation awarded under the Program to a petitioner ... for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subtitle *shall only include the compensation described in paragraphs (1)(A) and (2) of subsection (a).*

(emphasis added). The National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3768 (1986) (prior to the 1987 amendment). The compensation referred to in paragraphs (1)(A) and (2) of subsection (a) of § 300aa–15 includes prospective, unreimbursable medical expenses from the date of judgment and an award of $250,000.00 in the event of a vaccine-related death.

In 1987, this statutory provision was amended by the Omnibus Budget Reconciliation Act.[9] The amendment deleted the underlined portion quoted above and added additional language. The provision, as amended, and as it was effective when petitioners' case was filed with the court, reads:

(b) Vaccines administered before effective date.

Compensation awarded under the Program to a petitioner under 300aa–11 [concerning the requirement of a petition] of this table for a vaccine-related injury or death associated with the ad-

---

**9.** Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 (1987).

ministration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(B) of subsection (a) [actual unreimbursable expenses incurred before the date of judgment] ... and *may include attorneys' fees and other costs included in a judgment under subsection (e)* [attorneys' fees] of this section, except that *the total amount that may be paid as compensation under paragraphs (3) [concerning loss of earnings] and (4) [concerning pain and suffering] of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.*

(emphasis and parenthetical explanations added). 42 U.S.C.A. § 300aa–15(b) (West Supp.1989).

Section (b), above, refers to 42 U.S.C.A. § 300aa–15(e) (West Supp.1989) which reads as follows:

(e) Attorneys' fees

(1) The judgment of the United States Claims court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition. If the judgment of the United States Claims Court on such a petition does not award compensation, the court may include in the judgment an amount to cover petitioners' reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the court determines that the civil action was brought in good faith and there was a reasonable basis for the claim for which the civil action was brought.

(2) If the petitioner, before the effective date of this subpart, filed a civil action for damages for any vaccine-related injury or death for which compensation may be awarded under the Program, and elected under section 300aa–11(a)(4) of this title to withdraw such action and

to file a petition for compensation under the Program, the judgment of the court on such petition may include an amount limited to the costs and expenses incurred by the petitioner and the attorney of the petitioner before the effective date of this subpart in preparing, filing, and prosecuting such civil action (including the reasonable value of the attorneys' time if the civil action was filed under contingent fee arrangements).

(3) No attorney may charge any fee for services in connection with a petition filed under section 300aa–11 of this title which is in addition to any amount included under paragraph (1) in a judgment on such petition.[10]

 This court finds that the meaning of the last clause of 42 U.S.C.A. § 300aa–15(b), when read in conjunction with 42 U.S.C.A. § 300aa–15(e), is that in retrospective, vaccine injury cases, a petitioner who is eligible for compensation may also be reimbursed for up to, but not more than, a total of $30,000.00, for all the following categories: pain and suffering, impaired wages, and attorneys' fees and other costs. Specifically, the phrase in section 2115(b), "the total amount that may be paid" clearly was intended to refer to a compilation of distinct amounts to be defined later within that clause. Furthermore, the $30,000.00 limitation encompasses any and all attorneys' fees and costs which may be awarded as part of the total compensation award. Respondent's interpretation is the more plausible, given the words of the statute, which seem to require the totaling together of the distinct amounts, up to a maximum of $30,000.00, "paid as compensation under paragraphs (3) and (4) of section (a) of this section and included as attorneys' fees and other costs under section (e) of this section." 42 U.S.C.A. § 300aa–15(b). Under this interpretation, the "and" serves as a coordinating conjunction, linking together the description of one amount with a distinct second amount, both of which then combine to form the "total amount." *See Mikulich v.*

---

**10.** Although section (e), above, was not altered, section (b), above, was changed by the Omnibus

Reconciliation Act of 1989, Pub.L. 101–239, 103 Stat. 2106, 2290.

*Secretary of the Department of Health and Human Services*, 18 Cl.Ct. 253 (1989) and *Matthews v. Secretary of the Department of Health and Human Services* 18 Cl.Ct. 514 (1989).

Although this court finds that the statutory language at issue is clear on its face, assuming, for arguments sake, that an ambiguity could be found in the words of the statute, as enacted, resort could be had to the legislative history in order to clear up the ambiguity. The 1987 amendment was adopted as part of an Omnibus Budget Reconciliation Act of 1987 Pub.L. No. 100–203, 101 Stat. 1330.

Initially, under the heading "Purpose and Summary," the committee report states that:

> [t]he legislation would amend the National Childhood Vaccine Compensation Act to create lump-sum payment methods for compensation, to limit compensation awards, and to authorize appropriations for payment of compensation for injuries associated with vaccines administered before the effective date of the compensation program.

H.R.Rep. No. 391(J), 100th Cong., 1st Sess. 690 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News, 2313–64. If we were to adopt the petitioners' interpretation, authorizing unlimited compensation under paragraphs (3) and (4) of section (a) and section (e) of 42 U.S.C.A. § 300aa–15, plus related attorneys' fees and other costs, in the instant litigation, as well as in the prior litigation, the effect would be to expand signifiantly the awards available in retroactive cases, rather than to limit them, as appears to have been the congressional intent. Respondent's proposed interpretation is more consistent with the legislative intent of the 1987 amendment to "limit compensation awards" to the extent that it places section 2115(e) attorneys' fees and other costs under a $30,000.00 ceiling, not present in the Vaccine Act as originally enacted.

Furthermore, letters from the Acting Director of the Congressional Budget Office,

as well as from Congressmen Dingell and Waxman, support the respondent's interpretation of the 1987 amendment. First, the Committee report contains an October 15, 1987 letter from the Acting Director of the Congressional Budget Office, which states: "Although the types of compensation payable would be expanded under the bill, a limit of $30,000 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering." H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 693 (1987) *reprinted in* 1987 U.S.Code Cong. & Admin.News at 2313–67. Presumably, if the Acting Director had wanted to suggest that the limitation applied only to attorneys' fees associated with demonstrating income loss and pain and suffering or only to attorneys' fees and costs associated with pursuing a claim in the United States Claims Court, he would not have referred to "the total of payments for income loss, attorneys' fees and pain and suffering." *Id.* Second, on September 22, 1987, Congressmen Dingell and Waxman wrote to the committee on Ways and Means suggesting ways to reduce the costs of funding the Vaccine Injury Compensation Program. One of the methods of reducing the cost of funding the Vaccine Act, specifically suggested by Congressmen Dingell and Waxman, included limiting attorneys' fees.[11]

Finally, the "Section–By–Section" analysis in the committee report supports the respondent's interpretation:

> The amendments also authorize payment for lost earnings and pain and suffering, but limit the amount of payment that can be made for all compensation except future medical expenses to a total of as much as $30,000, depending upon demonstrated need and particular circumstances. The court may allocate the compensation for these items as it finds appropriate in each individual case.

H.R.Rep. No. 391(I), 100th Cong. 1st Sess. 697–698 (1987) *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–71 to 72.

---

**11.** Referenced in a letter from the Secretary of the Department of Health and Human Services,

October 8, 1987 *reprinted in* 1987 U.S.Code Cong. and Ad.News 2313–74.

Therefore, based on the plain meaning of the statute, as well as the legislative history thereof, petitioners argument that the $30,000.00 dollar limit imposed under 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) does not apply to attorneys' fees and costs incurred in litigation of underlying tort claims prior to October 1, 1988, pursuant to 42 U.S.C.A. § 300aa–15(e)(2),[12] is incorrect. There can be no doubt that the $30,000.00 limitation imposed under 42 U.S.C.A. § 300aa–15(b) (West Supp.1989) includes attorneys' fees under 42 U.S.C.A. § 300aa–15(e) (West Supp.1989), and specifically 42 U.S.C.A. § 300aa–15(e)(2) (West Supp.1989).

Not only is the language of the statute clear, but a reading of the legislative history also supports the respondent's interpretation of 42 U.S.C.A. § 300aa–15(b) (West Supp.1989), limiting pain and suffering, impaired earnings, and attorneys' fees and other costs to $30,000.00. It remains, therefore, for the court, to review petitioners' specific claim for attorneys' fees and other costs. Regardless, however, an award for these items may not exceed a total of $30,000.00.

■ This court has determined that the appropriate method for calculating attorneys' fees awarded under the Vaccine Act is to use the "lodestar" model approach. The "lodestar" is the product of the reasonable hours expended, multiplied by the reasonable hourly rate, with upward or downward adjustments made to reflect certain additional factors discussed below. The resulting figure is presumed to represent a reasonable fee, to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "In requesting statutory fees, an attorney must use the same 'billing judgment' as an attorney would in billing a client." *Hensley*, at 434, 103 S.Ct. at 1939.

The reasonable hourly rate is determined by looking to "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

In calculating reasonable attorneys' fees, the second step is the more subjective. The "lodestar" figure can be adjusted, either upward or downward, through the application of various additional factors. As pointed out by counsel, among the factors to be considered are those identified in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

The fee applicant carries the burden of proof. *Blum v. Stenson*, 465 U.S. 886, 896 n. 12, 104 S.Ct. 1541, 1547 n. 12, 79 L.Ed.2d 891 (1984). To meet the burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As stated in *Martin v. United States*:

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in

---

**12.** If the petitioner, before the effective date of this subpart, had filed a civil action for damages for any vaccine-related injury or death for which compensation may be awarded under the Program, and elected under section 300aa–11(a)(4) of this title to withdraw such action and to file a petition for compensation under the Program, then the judgment of the court on such petition may include an amount limited to the costs and expenses incurred by the petitioner and the attorney of the petitioner before the effective date of this subpart in preparing, filing, and prosecuting such civil action (including the reasonable value of the attorney's time if the civil action was filed under contingent fee arrangements).

sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed. *Martin v. United States*, 12 Cl.Ct. 223, 227 (1987), (citing *Hensley v. Eckerhart*, 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943). To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. The applicant need not account for every minute expended. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

In support of his application for attorneys' fees, on July 7, 1989, petitioners' attorney, Andrew W. Dodd, submitted to the Special Master "Petitioners' Separate Brief In Re Attorney's Fees" in which petitioners' attorney requests payment for a total of 268.7 hours (219.2 hours for work from January 1, 1985 to October 1, 1989 and 49.5 for work from October 1, 1988 to July 7, 1989), at a rate of $250.00 per hour, for a total of $69,375.00. Of the total number of hours claimed, 219.2 hours relate to the prior civil action in another court, previously filed by the same parties now before this court, and 58.3 relate to the present proceeding in the Claims Court, as follows:

Time Expended By Counsel From January 1, 1985 To And Including October 1, 1988.

| Name | Position | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Andrew W. Dodd | Attorney | $250.00 | 194.2 | $48,550.00 |
| Richard W. Denver | Attorney | $250.00 | 25.0 | $ 6,250.00 |
| | | | | $54,870.00 |

Time Expended By Counsel From October 1, 1985 To The Present.

| Name | Position | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Andrew W. Dodd | Attorney | $250.00 | 58.3 | $14,575.00 |
| Total | | | | $69,375.00 |

In support of the prayer for compensation, counsel submitted to the Special Master an affidavit by an attorney, Anthony John Ward, a separate brief in support of petitioners' request for attorneys' fees, and a supplement thereto.

### 1. *Reasonable Hourly Rate*

In calculating a reasonable hourly rate, the court must consider "the prevailing market rate in the relevant community" for similar services by lawyers of comparable skill, experience and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Supreme Court noted in *Blum* that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult" and that "the hourly rates of lawyers in private practice also vary widely." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In

discussing the applicant's burden, the court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorneys' own affidavits— that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable and is referred to—for convenience—as the prevailing market rate.

*Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11.

■ Proof of prevailing market rates for a lawyer's services may be demonstrated in a number of ways, including: (1) affidavits of other attorneys or experts; (2) citations to prior precedents showing reasonable

rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases; (3) references to fee award studies showing reasonable rates charged or awarded in the relevant community; (4) testimony of experts or of other attorneys in the relevant community; (5) discovery of rates charged by the opposing party; (6) reliance on court's own expertise to recognize applicable prevailing rates. H. Newberg, *Attorney Fee Awards* 198 (1986).

█ In support of his claimed rate of $250 per hour, Mr. Dodd states that he was admitted to the practice of law in the State of California in 1970. He states that since 1980, his practice has been primarily devoted to children injured by the product D.P.T. and that he has personal experience in excess of 12,000 hours in the area of pharmaceutical products litigation, as well as involvement in professional associations. He also submitted the declaration of Anthony John Ward, a former associate of Mr. Dodd's and an attorney duly licensed to practice law in the State of California for over thirty (30) years. Mr. Ward states that, in his opinion, a rate of $250.00 for Andrew W. Dodd is a fair, reasonable, and a typical charge for such services in the County of Los Angeles, State of California.

In determining a reasonable hourly rate, the knowledge and expertise of a given attorney performing given work in a given case is an important element. Unfortunately on this issue, the affidavit of Mr. Ward is not enlightening, as it fails to discuss, in any detail, the particular knowledge or skill of Mr. Dodd. Because the applicant in this instance bears the burden of proof, "generalized and conclusory 'information and belief' affidavits from friendly attorneys" presenting a wide range of hourly rates, will not suffice. *Nat'l Assoc. of Concerned Vets. v. Sec. of Defense*, 675 F.2d 1319, 1325 (D.C.Cir. 1982). Moreover, counsel's own affidavit does not rise to the level of detail necessary to enable this court to determine whether $250.00 per hour is a reasonable hourly rate as applied to the instant case.

Moreover, to justify an hourly rate, not only must counsel demonstrate that he is skilled in the subject area, he must also produce evidence that those skills were needed in providing the services in the case in question. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. In other words, Mr. Dodd must bring forth at least some credible evidence suggesting that the services rendered, due to the complexity of issues involved or other factors, warrant the skills of an attorney commanding an hourly rate of $250.00.

The Vaccine Act was designed to provide an alternative to traditional litigation for those claiming vaccine-related injury or death. Through the Vaccine Injury Table, the Vaccine Act attempts to reduce the burden of proving causation. By design, the Act was: "[i]ntended to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury and without a demonstration that a manufacturer was negligent or that a vaccine was defective." H.R.Rep. No. 908, 99th Cong.2d Sess., pt. 1, at 12, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6353; *see also,* § 300aa–11(c)(1)(C)(i) and § 2113(a)(1). Particularly, in a case such as this, in which the petitioners have claimed an "on the table injury," and death has occurred, few issues can be identified as so complex as to justify a top hourly rate. Moreover, petitioners' counsel has pointed to no such complexities or peculiarities associated with the instant action.

We do not mean to imply that certain of the cases filed under the Vaccine Act could not present a level of difficulty to necessitate an expenditure of effort requiring such a high level of sophistication and expertise in the preparation and presentation of the evidence in the petition and in proceedings before the Special Master, so as to justify a $250.00 hourly rate. We find, however, that the instant case does not fall in this category. Certainly, the petition filed in this court was well prepared and documented. The petitioners here, however, present a relatively uncomplicated, albeit tragic, death case in which no contradictory testimony or evidence has presented itself in the medical or hospital records,

or was offered by the respondent. Moreover, the amount of compensation to be awarded is fixed by statute and is not subject to litigation. In fact, the only matter in dispute is regarding the appropriate amount of attorneys' fees. This court cannot believe that in determining the level of fees to be awarded to counsel, in the case of a relatively simple litigation proceeding, credit for a complex proceeding should be awarded based on the complexity of the attorneys' fee calculation. Moreover, in this case the attorney fee calculation was made more speculative and complex because counsel has failed to provide sufficient detail or documentation in his fee application and has chosen not to file an exception to the Special Master's Report, despite the recommendation made by the Special Master in his Report and Recommendation to the court to reduce the fee reimbursement rate requested by the petitioners' counsel.

In the instant case, counsel has failed to carry his burden of demonstrating that a rate of $250.00 per hour is appropriate in this case. Consequently, a reasonable fee must be established. The court agrees with the Special Master that $250.00 per hour is at the high end of hourly lodestar rates requested in Vaccine Act cases. Given the straight forward nature of this death case, the court, agrees with the Special Master that it cannot justify more than a rate of $175.00 per hour as reasonable and appropriate for either Mr. Dodd or Mr. Denver [13]. Moreover, this fee must be presumed acceptable to the petitioners and their counsel, since the Special Master's Report and Recommendation, included the $175.00 figure and the petitioner has not filed an objection to the Special Master's Report and Recommendation as provided for in 42 U.S.C.A. § 300aa–12(d). The court, therefore, adopts the finding of the Special Master that $175.00 per hour is a reasonable hourly rate. Having worked on

this case since it was filed, the Special Master should be in the best position to make the subtle judgments as to the quality of expertise required to handle the case and as to those hours for which compensation is appropriate.

2. *Reasonable Hours Expended*

In reporting time expended, the applicant need not account for every minute. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437, n. 12, 103 S.Ct. at 1941, n. 12. Once counsel appropriately identifies his time, those hours which reflect "excessive, redundant, or otherwise unnecessary" hours must be excluded by the court. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939. In requesting statutory fees, an attorney must use the same "billing judgment" as an attorney would in billing a client. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939 (citing *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original)).

Subsequently, on September 27, 1989 the Special Master issued an order wherein he requested the following:

In Exhibit E to Petitioners' Separate Brief in re Attorneys' Fees you set out time which was "expended by counsel" in connection with the claim arising from the death of Ronald Dean Morris, Jr. Was all of the time claimed expended by you personally? If not, please provide an itemized statement of the time incurred by each individual whose time is included in Exhibit E and provide a statement as to the professional qualifications of each individual.

Responding thereto, the petitioners' attorney, on October 5, 1989, submitted his

13. The Special Master in recommending an "across-the-board rate of $175.00 per hour," as reasonable attorneys' fees in this case, bases his decision, in part, on his eight prior fee requests in Vaccine Act cases. The Special Master indicates that the "hourly rates requested for attorneys in the eight prior cases have varied from

$95.00 to $200.00." Additionally, "[p]aralegal rates have varied between $20.00 and $50.00 per hour." The Special Master in arriving at an "across-the-board" hourly rate of $175.00 notes that this is the only case in which a single request for all legal work was submitted.

First Supplement To Petitioners' Separate Brief In Re Attorneys' Fees in which he indicated that 25.0 hours of the 219.2 hours of work expended during the period of January 1, 1985 to October 1, 1985 was performed by Richard W. Denver, a former associate of Mr. Dodd's.

Due to the lack of sufficient information about Mr. Denver's qualifications, this court finds it difficult to determine an appropriate hourly rate for Mr. Denver. However, because the court has found that the attorneys cannot recover more than a total of $30,000.00 for their fees and other costs, it is unnecessary to pick a compensible rate for Mr. Denver. Allocation of the $30,000.00 for attorneys' fees and other costs will be left to the petitioners and their several attorneys to resolve amongst themselves.

3. *Other Costs*

The court adopts the following uncontested, portion of the Special master's Report and Recommendation. Petitioners seek recovery of $6,437.82 in advanced costs. The following items are disallowed: (1) the two entries for "Federal Express" totaling $304.25, because these charges are analogous to postage, which is generally not taxable, *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir.1975) and (2) attorneys' travel expenses of $1,760 and cab fare of $26. *Id.; see also* cases cited at Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2676, n. 12 at 338. This leaves allowable costs of $4,347.57.

CONCLUSION

The court, therefore, hereby, ORDERS as follows: the petitioners are awarded a total of $280,000.00. $250,000.00 is awarded to petitioners, Ronald Dean Morris, Sr. and Mary L. Morris, for the death of their son, Ronald Dean Morris, Jr., and $30,000 is awarded for attorneys' fees and other costs incurred during litigation.

IT IS SO ORDERED.

